In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1734

DANIEL ENGEL, in his capacity as
administrator of the Estate of Gary Engel,

*Plaintiff-Appellee,*

*v.*

ROBERT BUCHAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 3288—**Milton I. Shadur**, *Judge.*

ARGUED JANUARY 19, 2012—DECIDED MARCH 5, 2013

Before KANNE, SYKES, and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge.* Gary Engel was convicted in 1991 in Missouri state court for a drug-related kidnapping and was sentenced to 90 years in prison. In 2010 the Missouri Supreme Court vacated the conviction based on the State's failure to disclose exculpatory evidence—specifically, that a police investigator had paid a key witness to testify—thus violating Engel's due-process

rights under *Brady v. Maryland*, 373 U.S. 83 (1963). *See State ex rel. Engel v. Dormire,* 304 S.W.3d 120, 127-30 (Mo. 2010) (en banc). The State declined to retry Engel, and he was released after having served 19 years behind bars.

Engel then brought this lawsuit alleging a host of state and federal claims against the officers involved in his case, the local police department that oversaw the investigation, and the United States. Of particular relevance to this appeal is Engel's claim against Robert Buchan, a now-retired FBI agent, brought under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Engel claims that Buchan framed him by fabricating evidence and manipulating witnesses, then suppressed this evidence in violation of *Brady*. Buchan moved to dismiss, arguing that (1) a *Bivens* remedy is not available for *Brady* violations; and (2) qualified immunity applies because Engel did not plead a plausible claim for a violation of his constitutional rights. The district court denied the motion, and Buchan appealed.

We affirm. A *Bivens* cause of action is available for violations of *Brady*. Although the Supreme Court has cautioned against extending *Bivens* to new contexts, this case meets the Court's requirements for doing so and is materially indistinguishable from *Bivens* itself. And Engel's complaint contains enough factual specificity to state a plausible claim for violation of his due-process rights under *Brady*. Because the *Brady* obligation was well established at the time of the events at issue here (Buchan does not argue otherwise), qualified immunity does not apply.

## I. Background

The following account is from Engel's amended complaint; we accept the well-pleaded factual allegations as true at this stage of the litigation.[1] *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009). The facts and legal contentions are closely related to those in a similar case brought by Steven Manning, a former Chicago police officer and FBI informant whose claims against Buchan and others have been before this court on two occasions. *See Manning v. Miller*, 355 F.3d 1028 (7th Cir. 2004) ("*Manning I*"); *Manning v. United States*, 546 F.3d 430 (7th Cir. 2008) ("*Manning II*"). In 1986 Manning ceased working as an informant for the FBI and thereafter came under investigation for a number of serious crimes, including the 1984 kidnapping of two drug dealers in Kansas City, Missouri, and two murders in Illinois. Buchan, then an FBI agent based in Chicago, was in charge of the probe. He was assisted by Robert Quid, then a police officer for the Village of Buffalo Grove, Illinois, where one of the murders was committed. During the course of the Manning investigation, Buchan and Quid approached Engel, who was a friend of Manning's. Engel alleges that the two officers threatened to implicate him in the kidnapping if he did not cooperate in their investigation of Manning.

---

[1] Engel's counsel recently filed a suggestion of death notifying the court that Engel has died. We have substituted the administrator of his estate as the plaintiff-appellee in the caption but refer to Engel as the plaintiff throughout.

Engel denied involvement in the kidnapping and said he knew nothing that would help the murder investigation.

Rebuffed, Buchan and Quid made good on their threat to implicate Engel in the kidnapping. They built a false case against Engel and caused him to be arrested and charged in Missouri state court with two counts of kidnapping and related crimes. Manning, too, was arrested and charged in the Missouri kidnapping; he was also charged in Illinois state court for the 1990 murder of James Pellegrino. Manning was convicted on the Missouri kidnapping charges and received a lengthy prison sentence. Engel was tried separately in 1991 and was convicted on all counts and sentenced to 90 years in prison. Two years later Manning stood trial in Illinois for the Pellegrino murder. He was convicted and sentenced to death.

In 1998 the Illinois Supreme Court reversed Manning's murder conviction. *See People v. Manning,* 695 N.E.2d 423 (Ill. 1998). His Missouri kidnapping convictions were also overturned on federal habeas review in 2002. *See Manning v. Bowersox,* 310 F.3d 571 (8th Cir. 2002). Manning then sued Buchan, Quid, and others in federal court in the Northern District of Illinois asserting constitutional claims under *Bivens* and 42 U.S.C. § 1983 and several common-law claims under the Federal Tort Claims Act ("FTCA") and state law. Gary Miller, an FBI agent who worked with Buchan on the Manning case, was among the defendants. As relevant here, Manning alleged that Buchan, Miller, and Quid framed him by

using highly suggestive lineups, inducing a jailhouse informant to testify falsely against him, knowingly submitting false reports that Manning had confessed, and destroying or tampering with physical evidence.

Buchan and Miller moved to dismiss based on absolute and qualified immunity,[2] but the district court denied the motion, and we affirmed on interlocutory appeal. *Manning I*, 355 F.3d at 1029. We held that Manning's allegations stated a valid constitutional claim based on *Brady*, not just a common-law claim for conspiracy to commit perjury, which might have been barred by absolute immunity. *Id.* at 1031-33. We also held that the agents were not protected by qualified immunity because the constitutional right in question was clearly established at the time of the events at issue in the case. *Id.* at 1034 ("prior to the actions that gave rise to this case, it was well established that investigators who withhold exculpatory evidence from defendants violate the defendant's constitutional due process right"). When the case returned to the district court, Manning prevailed on his *Bivens/Brady* claim against Buchan and Miller, winning a $6.5 million judgment.[3] The jury entered specific findings that the agents had

---

[2] They actually filed a motion for summary judgment, but we treated it as a motion to dismiss because discovery had not yet occurred. *Manning v. Miller,* 355 F.3d 1028, 1031 (7th Cir. 2004) ("*Manning I*").

[3] Manning's claims against Quid and the Village of Buffalo Grove were settled.

fabricated evidence and concealed material exculpatory evidence in both the Missouri and Illinois cases. *Manning II,* 546 F.3d at 432.

Manning then suffered a sharp reversal of fortune in his civil-rights case. After judgment was entered on the *Bivens* claim against Buchan and Miller, the FTCA claim against the United States was tried to the court. The district court ruled against Manning on the merits of this claim and then vacated the prior judgment against Buchan and Miller in the light of the FTCA's judgment bar. *See* 28 U.S.C. § 2676. In *Manning II* we affirmed this decision, acknowledging the harshness of the result but nevertheless concluding that the plain language of the FTCA's judgment bar required the district court to vacate the judgment on the *Bivens* claim. 546 F.3d at 433-38.

Engel had followed the developments in the *Manning* litigation and in 2007 filed a state habeas petition seeking to have his convictions vacated. The lower courts denied the petition, but in 2010 the Missouri Supreme Court granted relief, holding that the State had violated *Brady* by failing to disclose that one of its key witnesses, a drug dealer named Anthony Mammolito, had been paid to testify. *State ex rel. Engel*, 304 S.W.3d at 122-24. The State was given 60 days to retry Engel but chose not to do so. In 2010 Engel was released from prison after 19 years of incarceration.

Engel then filed this suit in the Northern District of Illinois asserting a *Bivens* claim against Buchan for violation of *Brady*; claims under § 1983 against Quid and the Village of Buffalo Grove; RICO claims against Buchan,

Quid, and the Village; an FTCA claim against the United States; and state-law claims for malicious prosecution and intentional infliction of emotional distress. Buchan moved to dismiss the *Bivens* claim, arguing that (1) a *Bivens* damages remedy is not available for *Brady* violations; and (2) qualified immunity applies.

The district court rejected both arguments. Regarding the availability of *Bivens*, the court construed our decision in *Manning I* as having resolved the question; there, we rejected the agents' immunity arguments and allowed Manning to proceed with his *Bivens* claim for the alleged violation of *Brady*. 355 F.3d at 1031-33. As for Buchan's assertion of qualified immunity, the court again relied on *Manning I*, noting that Engel's complaint alleged the same basic facts that had sufficed to overcome the qualified-immunity claims in Manning's case. The court thus denied the motion to dismiss,[4] and Buchan appealed.

## II. Discussion

The case is before the court on Buchan's interlocutory appeal from the district court's denial of his motion to dismiss, *see* FED. R. CIV. P. 12(b)(6), based on qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (authorizing immediate appeal of a denial of immunity).

---

[4] Buchan also moved to dismiss Engel's RICO claim. The district court granted this part of the motion, and that decision is not at issue here.

Our review is de novo. *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). The issue of qualified immunity necessarily includes the predicate question of whether a *Bivens* remedy is available in this context at all. *See Wilkie v. Robbins*, 551 U.S. 537, 548-49 (2007); *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). Buchan argues that (1) the *Bivens* remedy should not be extended to *Brady* violations; and (2) even if *Bivens* applies, he is entitled to qualified immunity because the complaint lacks the factual specificity required to state a plausible violation of Engel's constitutional rights.

## A. *Bivens* **Remedy for** *Brady* **Violations**

Our initial question is whether a violation of *Brady* by an FBI agent may be redressed in a cause of action for damages under the doctrine announced in *Bivens*. As a threshold matter, the parties dispute whether our decision in *Manning I* already resolved this question. Engel relies on the following passage contained in a footnote in *Manning I*:

> Manning brings this claim against federal investigators under the authority of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). Although this Circuit has not explicitly recognized that *Bivens* may be employed to bring a *Brady* claim, we have recognized that *Bivens* may be used to bring claims for violations of procedural and substantive due process. *See Alejo v. Heller*, 328 F.3d 930 (7th Cir. 2003); *Hoosier Bancorp of Ind. v. Rasmussen*, 90 F.3d 180 (7th Cir. 1996).

> We have also entertained the use of a *Bivens* cause of action where the plaintiff complains that law enforcement officers created false evidence to be used at trial. *Hammond v. Kunard*, 148 F.3d 692, 694-95 (7th Cir. 1998).

355 F.3d at 1031 n.1. Engel reads this language as a holding that *Bivens* is available to redress a violation of *Brady*. Buchan counters that the footnote is only an *assumption* to that effect; he also notes that *Manning I* was decided before the Supreme Court's decision in *Wilkie* and our more recent decision in *Carvajal*, both of which, he contends, suggest that *Bivens* is not available to remedy a *Brady* violation.

Engel is correct on this point. The passage we have quoted can only be understood as a holding. The procedural posture of *Manning I* was identical to the present case, and indeed one of the issues raised in *Manning I* was whether a *Bivens* action is available for a *Brady* violation. The *Bivens* question was briefed in *Manning I*,[5] and

---

[5] Buchan now suggests that the only issue he briefed in *Manning I* was whether to extend *Brady* to law-enforcement officers (as opposed to just prosecutors) and not whether *Bivens* is available for *Brady* violations. To the contrary, an entire section of Buchan's opening brief in *Manning I* was titled "There Is No Sound Basis for Authorizing *Bivens* Actions Based on *Brady* Claims Against Law Enforcement Officers," and his very first argument in that section discusses the Supreme Court's reluctance to extend *Bivens* to new con-

(continued...)

its resolution was a necessary predicate for our rejection of the immunity claims raised by Buchan and Miller on interlocutory appeal. Manning quite obviously could not have proceeded with his *Brady* claims against the two FBI agents if he lacked a cause of action, which could only arise under *Bivens*. To affirm the denial of the motion to dismiss in that case was necessarily to find a valid cause of action, so we cannot credit Buchan's argument that *Manning I* only *assumed* that *Bivens* is available to remedy *Brady* violations. Indeed, the case proceeded to trial and a $6.5 million judgment was entered against the two agents on the *Bivens/Brady* claim, *see Manning II*, 546 F.3d at 432, which could not have occurred if our discussion of *Bivens* was understood as a nonbinding assumption.

We acknowledge, however, that the footnote in *Manning I* gave the matter only cursory attention.[6] And Buchan is right that recent developments in the Supreme Court's *Bivens* jurisprudence require a more complete analysis of the question. We undertake that analysis here, starting with *Bivens* itself.

---

[5] (...continued)
texts. *See* Br. for Appellants in *Manning I, available at* 2003 WL 22721335, at *34.

[6] The cases cited in the *Manning I* footnote do not directly address whether a *Bivens* action for damages is available for violations of *Brady. See Manning I*, 355 F.3d at 1031 n.1 (citing *Alejo v. Heller*, 328 F.3d 930 (7th Cir. 2003); *Hammond v. Kunard*, 148 F.3d 692, 694-95 (7th Cir. 1998); *Hoosier Bancorp of Ind. v. Rasmussen*, 90 F.3d 180 (7th Cir. 1996)).

In *Bivens* the Supreme Court recognized an implied cause of action for damages against federal officers to redress a constitutional violation—there, an alleged violation of the Fourth Amendment by federal law-enforcement agents in connection with a warrantless search and seizure. 403 U.S. at 389-90. The Court did so notwithstanding the absence of a statutory right of action, finding "no special factors counseling hesitation in the absence of affirmative action by Congress," *id.* at 396, and no express statement from Congress that relief should *not* be available under the circumstances, *id.* at 397; *see also Vance v. Rumsfeld*, 701 F.3d 193, 198 (7th Cir. 2012) (en banc) ("*Bivens* was the first time the Supreme Court created a non-statutory right of action for damages against federal employees."). The decision rested on a general premise that "'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.'" *Id.* at 392 (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

*Bivens* was decided in 1971, and during the next decade, the Court twice extended its holding to new contexts. In *Davis v. Passman*, 442 U.S. 228, 230 (1979), the Court authorized a *Bivens* cause of action for discrimination in public employment in violation of the Fifth Amendment. In *Carlson v. Green*, 446 U.S. 14, 18 (1980), the Court recognized a *Bivens* claim against federal prison officials for Eighth Amendment violations. The FTCA would have provided relief in *Carlson*, but the Court nonetheless found the *Bivens* remedy available because Congress had not "explicitly declared" that the

FTCA was "to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Id.* at 18-19.

Since *Carlson,* however, the Court has not authorized a *Bivens* action in any other context. Rather, the Court's decisions have refined and narrowed the doctrine in several important respects. First, the Court has identified specific contexts in which "special factors" counsel against extending the *Bivens* remedy—factors often keyed to concerns about the special status of the federal defendants or sensitivity to the nature of the governmental activity involved. *See, e.g., Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 63 (2001) (no *Bivens* action against private correctional corporation acting under color of federal law); *FDIC v. Meyer*, 510 U.S. 471, 473 (1994) (no *Bivens* action against a federal agency); *United States v. Stanley*, 483 U.S. 669, 683-84 (1987) (no *Bivens* action for injuries arising out of or in the course of activity incident to military service); *Chappell v. Wallace*, 462 U.S. 296, 299-302 (1983) (same). Second, the Court has explained that the existence of a comprehensive, alternative remedial scheme may preclude a *Bivens* remedy even where the alternative relief is imperfect compared to *Bivens* and Congress has not explicitly declared it to be a substitute. *See, e.g., Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988) (no *Bivens* action for an alleged due-process violation in connection with the denial of disability benefits because relief is available under a comprehensive statutory scheme); *Bush v. Lucas*, 462 U.S. 367, 368 (1983) (no *Bivens* action where a

federal employer commits a First Amendment violation because relief is available under a comprehensive statutory scheme).

The Court synthesized these refinements in *Bivens* doctrine in *Wilkie*, 551 U.S. at 541, which involved a Fifth Amendment claim by a landowner who alleged that federal employees had engaged in a campaign of harassment and intimidation to induce him to give an easement over his property. The Court distilled its *Bivens* jurisprudence into a two-step framework for evaluating whether to authorize an implied right of action for damages against a federal official for a constitutional violation:

> [O]ur consideration of a *Bivens* request follows a familiar sequence, and on the assumption that a constitutionally recognized interest is adversely affected by the actions of federal employees, the decision whether to recognize a *Bivens* remedy may require two steps. In the first place, there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages. But even in the absence of an alternative, a *Bivens* remedy is a subject of judgment: "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation."

*Id.* at 550 (citation omitted) (quoting *Bush*, 462 U.S. at 378).

Applying this two-step inquiry, the Court declined to extend *Bivens* to the landowner's property-rights claim. At step one—the evaluation of alternative remedies—the Court observed that the landowner had several avenues of judicial and administrative redress for much of the wrongdoing he alleged. *Id.* at 554. But that was not enough to resolve the matter; the Court said "the forums of defense and redress open [to the landowner] are a patchwork, an assemblage of state and federal, administrative and judicial benches applying regulations, statutes, and common law rules." *Id.*; *see also id.* at 555 ("The whole here is greater than the sum of its parts."). So the Court moved on to step two of the analysis and considered whether "special factors" counseled against recognizing an implied right of action. At this step the Court concluded that the contours of the claimed constitutional violation were too undefined to support a judicially created remedy:

> [T]o create a new *Bivens* remedy . . . on a theory of retaliation for exercising [the] property right to exclude, or . . . a general theory of unjustifiably burdening [the] rights [of] a property owner, raises a serious difficulty of devising a workable cause of action. A judicial standard to identity illegitimate pressure going beyond legitimately hard bargaining would be endlessly knotty to work out, and a general provision for tortlike liability when Government employees are unduly zealous in pressing a governmental interest affecting property would invite an onslaught of *Bivens* actions.

*Id.* at 562.

In *Minneci v. Pollard*, 132 S. Ct. 617 (2012), the Court reaffirmed the two-step analysis announced in *Wilkie*, essentially treating it "as a restatement of the governing principles." *Vance*, 701 F.3d at 199. Applying the *Wilkie* method, the Court in *Minneci* declined to extend *Bivens* to a prisoner's suit against employees of a privately operated prison for alleged violations of the Eighth Amendment in the provision of medical care. 132 S. Ct. at 626. *Minneci* was actually resolved at step one of the process; the Court found that state tort remedies were available and adequate to redress the prisoner's claim for improper medical care. *Id.* at 627.

We recently addressed the Supreme Court's *Bivens* jurisprudence in our en banc decision in *Vance*, issued just a few months ago. There, we noted that the Court "has not created [a *Bivens* right of action] during the last 32 years" and indeed has "reversed more than a dozen appellate decisions that had created new actions for damages." 701 F.3d at 198. This suggested, we said, that "[w]hatever presumption in favor of a *Bivens*-like remedy may once have existed has long since been abrogated." *Id.* Following the analysis articulated in *Wilkie*, we declined to authorize a *Bivens* remedy against persons in the military chain of command for torture claims by U.S. citizens held in military detention overseas. *Id.* at 198-205.

With this legal background in place, we can now apply the refined analysis established in *Wilkie* for evaluating new *Bivens* claims, placing no thumb on the scale in favor of authorizing a remedy. Our first question under

the *Wilkie* formula (and the only real point of contention between the parties) is whether alternative remedies exist to redress the alleged violation of Engel's due-process rights, and whether those alternatives amount to a "convincing reason" to refrain from extending *Bivens* here. The alternatives need not provide complete relief to preclude the *Bivens* remedy, *Chilicky*, 487 U.S. at 425, and where Congress has created an "elaborate, comprehensive scheme" to address a certain kind of constitutional violation, *Bivens* will generally be unavailable even if that scheme leaves remedial holes, *Bush*, 462 U.S. at 385. Similarly, where the alternative remedies are the product of state law, they need not be "perfectly congruent" with the *Bivens* remedy; rather, the question is whether the alternatives "provide roughly similar incentives for potential defendants to comply with [the constitutional requirements] while also providing roughly similar compensation to victims of violations." *Minneci*, 132 S. Ct. at 625. Mere "patchworks" of remedies arising from an array of different legal sources may be insufficient to foreclose *Bivens*. *Wilkie*, 551 U.S. at 554.

Buchan first argues that the *Brady* obligation itself—that is, the requirement that prosecutors and police officers disclose exculpatory material to the defense, *Brady*, 373 U.S. at 87—is adequate in itself to secure the due-process rights of criminal defendants. This argument misunderstands the nature of the government's duty under *Brady*. The *Brady* obligation is not a mere prophylactic designed to protect a constitutional right, it is *itself* a component of the due process owed to criminal defendants under the Constitution. *Id.* ("[T]he suppression by

the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . .").[7] The failure of the government's agents to adhere to the *Brady* obligation is the very constitutional wrong that wants for redress, so it cannot be right to say that the duty of disclosure is itself a sufficient remedy for the constitutional violation. The disclosure rule cannot be both the duty *and* the remedy for its violation.

Buchan next suggests that habeas corpus is an adequate alternative remedy that defeats Engel's effort to invoke *Bivens* in this context. Because the harm at stake in a *Brady* violation is an unjust conviction, and a defendant who suffers a violation of *Brady* may use habeas to obtain relief from that conviction, Buchan argues that a *Bivens* remedy should not be available here. But the habeas remedy is limited to securing prospective relief from unlawful incarceration, halting the ongoing harm from a conviction prejudicially tainted by a constitutional violation—a powerful remedy to be sure, but not a *compensatory* one. The habeas writ is akin to an injunction; it cannot provide a retrospective compensatory remedy. Stated differently, habeas corpus is categorically incapable of compensating the victim of

---

[7] The Supreme Court has clarified that *Brady* applies whether or not the defense requests the evidence; the *Brady* disclosure duty extends to impeachment evidence; and the disclosure duty includes exculpatory evidence known only to the police. *See Strickler v. Greene,* 527 U.S. 263, 280-81 (1999).

a *Brady* violation for the constitutional injury he has suffered. The Supreme Court reiterated in *Minneci* that the alternative remedy need not be "perfectly congruent" to *Bivens* but should provide "roughly similar incentives" for compliance with constitutional requirements and "roughly similar compensation to victims of violations." *Minneci*, 132 S. Ct. at 625. Habeas corpus may operate as an indirect incentive to induce constitutional compliance, but it cannot perform a compensatory function.[8]

It is true that in some contexts the availability of habeas corpus weighs against authorizing a *Bivens* remedy, but that is usually so when habeas is one element of a broader, integrated remedial scheme. *See, e.g.*, *Mirmehdi v. United States*, 685 F.3d 975, 981-82 (9th Cir. 2012) (declining to recognize a *Bivens* remedy for claimed constitutional violations in the immigration context in light of the availability of habeas corpus as one component of a comprehensive adjudicative and remedial process); *Rauschenberg v. Williamson*, 785 F.2d 985, 987 (11th Cir. 1986) (declining to recognize a *Bivens* remedy in a suit for damages against a parole officer

---

[8] In *Carvajal v. Dominguez*, 542 F.3d 561, 570-71 (7th Cir. 2008), we expressed doubt about the availability of *Bivens* in the context of a *Brady* violation, briefly suggesting that the *Brady* disclosure obligation itself, and the availability of process to overturn the conviction, might suffice as alternatives. *Carvajal* was decided on other grounds, however, so this short discussion was dicta.

in light of the availability of habeas corpus in addition to other administrative remedies).

Finally, Buchan points to the existence of two statutory remedies that provide public compensation for wrongful incarceration in certain limited circumstances. In the case of a wrongful conviction for a federal crime, the Court of Federal Claims has jurisdiction under 28 U.S.C. § 1495 to award up to $50,000 per year of incarceration (or $100,000 per year in the case of death sentences) if the defendant can show that "[h]is conviction has been reversed or set aside on the ground that he is not guilty of the offense of which he was convicted." 28 U.S.C. § 2513(a)(1). And Missouri has adopted a limited wrongful-conviction statute allowing for compensation of up to $50 per day of wrongful incarceration, but only if the defendant is "determined to be actually innocent of such crime solely as a result of DNA profiling analysis." MO. REV. STAT. § 650.058.

Neither of these statutes can provide relief to Engel. He was not convicted of a federal crime, and his Missouri convictions were vacated on the basis of a due-process violation, not "actual innocence," much less actual innocence determined solely by DNA analysis. Still, the existence of a statutory compensatory remedial scheme— even if unavailable to Engel—at least addresses the *kind* of remedy that *Bivens* would provide (in contrast to habeas corpus), and depending on the degree of legislative attention *in general*, this might count as a reason not to extend *Bivens* to this context.

But Buchan has given us little to support his argument in this regard. He mentions only the federal and Missouri statutes, hardly enough on which to base a conclusion that remedial alternatives exist to compensate victims of *Brady* violations by federal agents.[9] We are independently aware that about half the states provide by statute for some form of public compensation for wrongful convictions, though the coverage of these statutes is limited and varies widely. *See* Justin Brooks & Alexander Simpson, *Find the Cost of Freedom: The State of Wrongful Conviction Compensation Statutes Across the Country and the Strange Legal Odyssey of Timothy Atkins,* 49 SAN DIEGO L. REV. 627, 633 n.59 (2012) (collecting state statutes). And as we have noted, Buchan has made no effort to demonstrate as a general matter that the various statutory remedies—where they exist—reasonably approximate *Bivens.* That is, it is far from clear that the existing statutory remedies for wrongful convictions provide "roughly similar incentives" for constitutional compliance and "roughly similar compensation" for victims of *Brady* violations. *Minneci,* 132 S. Ct. at 625.

That *some* jurisdictions provide public compensation for *some* wrongful convictions does not definitively foreclose a *Bivens* remedy here. At most, the legal landscape resembles the "patchwork" of remedies that was insufficient, without more, to resolve the *Bivens* question

---

[9]  Buchan does not argue that the FTCA or state common-law remedies are adequate alternatives to *Bivens. See Minneci v. Pollard*, 132 S. Ct. 617, 624-26 (2012).

at step one in *Wilkie*. 551 U.S. at 554. Accordingly, we cannot conclude that alternative compensatory process exists to remedy violations of the *Brady* right, much less that the alternatives amount to a "convincing reason" not to authorize a *Bivens* remedy.

We proceed, then, to step two of the *Wilkie* framework, which requires us to consider whether "any special factors counsel[] hesitation before authorizing a new kind of federal litigation." *Id.* at 550 (quotation marks omitted). Buchan has not identified any special factors, and we ourselves see none. As we have noted, this part of the analysis has tended to focus on concerns about judicial intrusion into the sensitive work of specific classes of federal defendants—military officials in *Stanley* and *Vance*, for example; immigration authorities in *Mirmehdi*; and federal agencies in *Meyer*—and sometimes also concerns about doctrinal unworkability, as in *Wilkie*.

Here, in contrast, an FBI agent stands accused of violating the constitutional rights of a person targeted for a criminal investigation and prosecution. This parallels *Bivens* itself. In all material respects, the *Brady* claim at issue in this case is very much like the Fourth Amendment claim in *Bivens*. We are hard-pressed to identify a distinction that makes a difference. A *Bivens*/*Brady* claim presents no great problem of judicial interference with the work of law enforcement, certainly no greater than the Fourth Amendment claim in *Bivens*. The legal standards for adjudicating the claim are well established and easily administrable. A sound common-law remedial determination should also take account of the

general problem of overdeterrence, but we cannot see how prosecutors and law-enforcement officers could be "overdeterred" in the disclosure of exculpatory material to criminal defendants. Buchan has not argued that authorizing a damages remedy for *Brady* violations by federal agents will have a deleterious effect on law enforcement, nor has he tried to distinguish a *Brady* claim from the Fourth Amendment claim at issue in *Bivens*.

Instead, he has argued with great emphasis that the ground has shifted under *Bivens*, shaking its doctrinal foundations. No doubt that is true, as we have previously acknowledged. *See Robinson v. Sherrod*, 631 F.3d 839, 842 (7th Cir. 2011) ("*Bivens* is under a cloud, because it is based on a concept of federal common law no longer in favor in the courts: the concept that for every right conferred by federal law the federal courts can create a remedy above and beyond the remedies created by the Constitution, statutes, or regulations."). But shaky or no, *Bivens* remains the law, and we are not free to ignore it. As recently as last year, the Supreme Court reaffirmed the standards for resolving new *Bivens* questions. *Minneci*, 132 S. Ct. at 621. Applying those standards here, we conclude, consistent with our decision in *Manning I,* that a *Bivens* cause of action is available for a *Brady* violation committed by a federal law-enforcement agent in connection with a state criminal prosecution.

## B. Qualified Immunity

Buchan also argues that even if Engel has a cause of action under *Bivens*, qualified immunity applies because

the complaint does not contain sufficiently specific factual allegations to plausibly state a claim for violation of Engel's due-process rights. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome a defense of qualified immunity at the pleading stage, the complaint must contain sufficient factual allegations to show that the defendant's conduct violated a constitutional right and that the right was clearly established at the time of the alleged violation. *Id.* at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

It is beyond dispute that the *Brady* right was well established at the time of the events set forth in Engel's complaint. *See Newsome v. McCabe*, 256 F.3d 747, 752-53 (7th Cir. 2001) ("The *Brady* principle was announced in 1963, and we applied it in *Jones* [*v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)] to affirm a hefty award of damages against officers who withheld exculpatory information in 1981."). Buchan does not argue otherwise. Instead, he maintains that Engel's complaint lacks sufficient factual content to state a claim for a *Brady* violation under the pleading standard announced in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

To survive a motion to dismiss under that standard, Engel's complaint must "state a claim to relief that is

plausible on its face," *Twombly*, 550 U.S. at 570, which in turn requires sufficient factual allegations to permit the court to draw a reasonable inference that the defendant is liable for the misconduct alleged, *id.* at 556. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). Purely legal conclusions are insufficient. *Id.* ("Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice.").

The *Twombly*/*Iqbal* "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Plausibility is "not akin to a 'probability requirement,'" but the plaintiff must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. We have interpreted the plausibility standard to mean that "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). "In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Id.*

Buchan argues that Engel makes only conclusory allegations with respect to his central claim of wrong-doing—as, for example, when he alleges that "[a]ll of the evidence introduced against Plaintiff at his trial was the product of intentional misconduct by the Defen-

dants, who fabricated evidence, manipulated witnesses, and withheld exculpatory evidence." Were this the entirety of the factual allegations in the complaint, Buchan might have a point. "Intentional misconduct," "fabricated evidence," and "manipulated witnesses" are highly generalized factual allegations, and to allege that the defendants "withheld exculpatory evidence" is basically to state the definition of a *Brady* claim.

But *Iqbal* makes clear that "legal conclusions can provide the framework of a complaint" so long as they are "supported by factual allegations," *Iqbal*, 556 U.S. at 679, and that is the case here. Read as a whole, Engel's complaint easily contains enough specific factual allegations to state a plausible claim for violation of his due-process rights under *Brady*. The complaint describes at length and in detail the history we have recited above, describing how Buchan and Quid first targeted Manning, framed him for the kidnapping in Missouri and the Pellegrino murder in Illinois, and then approached Engel. The complaint alleges that the defendants "informed Plaintiff that they were going to implicate him in the Missouri kidnaping," and that "if he was willing to implicate Mr. Manning in the crimes they were investigating, then Plaintiff would be dealt with leniently." The complaint further alleges that the defendants "ignored Plaintiff's protestations of innocence and noninvolvement," and goes on to describe Engel's prosecution and conviction, and also Manning's, and then explains how and why their convictions were overturned.

With respect to Engel in particular, the complaint alleges that the Missouri Supreme Court "concluded that material, exculpatory evidence had been withheld from Plaintiff in violation of his constitutional rights." The suppressed exculpatory evidence "included, but was not limited to, previously-undisclosed evidence that the key witness against Plaintiff had received monetary payments in exchange for his testimony."[10] The complaint also alleges that the defendants "fabricated false reports and other evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff," and "engaged in . . . unduly suggestive identification procedures." These allegations, read in context with the rest of the complaint, surpass the plausibility threshold of *Twombly* and *Iqbal*.

Buchan insists that the complaint lacks *specificity* because the allegations often refer to "the [d]efendants" generally, without differentiating between them. *See Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008) (plaintiffs may not rely on "[v]ague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged unconstitutional conduct"). But reading the allegations sensibly and as a whole, there is no genuine uncertainty

---

[10] Buchan objects that the complaint does not specify who this witness actually was, but he also acknowledges that he understands this allegation to refer to Anthony Mammolito, who was specifically identified by the Missouri Supreme Court as the witness who was paid to testify.

regarding who is responsible for what. Wherever the complaint mentions specific misconduct in Engel's investigation and prosecution—withheld evidence, manipulated testimony, fabricated reports, suggestive identification procedures, and so on—there can be no doubt that it refers to Buchan and Quid, the two law-enforcement officers involved in the case. And they are accused of acting jointly. The complaint alleges that Buchan and Quid approached Engel together and threatened to implicate him in the Missouri kidnapping; the natural inference is that the misconduct that followed during the investigation and prosecution was committed by these two as well. The only other parties named as defendants—the Village of Buffalo Grove and the United States—are nonpersonal entities, so it would make no sense to think the complaint was referring to them when describing these specific, personal actions. Engel's complaint is therefore quite different from the one in *Grieveson*, where a prisoner asserted § 1983 claims against seven different officers arising from seven different attacks without tying any particular officer to any particular injury. *See id.* at 777-78.

Accordingly, we agree with the district court that Engel's complaint states a plausible claim for violation of his due-process rights under *Brady.* It is undisputed that the *Brady* right was well established at the time of the events alleged in the complaint. Buchan is not entitled to qualified immunity.

### III. Conclusion

For the foregoing reasons, we conclude that a cause of action under *Bivens* is available for a violation of *Brady* by a federal law-enforcement agent. Engel's complaint contains sufficient factual allegations to state a plausible claim for violation of his due-process rights under *Brady.* Because the *Brady* right was well established at the time of the alleged violation, Buchan is not entitled to qualified immunity.

AFFIRMED.