NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued September 8, 2017
Decided October 2, 2017

**Before**

DANIEL A. MANION, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No.   16-3520

| | |
|---|---|
| AHMAD FARID KHORRAMI,<br>*Plaintiff-Appellant*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No.   03-cv-06579 |
| MICHAEL E. ROLINCE, et al.,<br>*Defendants-Appellees*. | James B. Zagel,<br>*Judge*. |

## O R D E R

Shortly after the September 11, 2001, terrorist attacks on the United States, the Department of Justice ("DOJ") instituted a "Hold Until Cleared" policy. Under this policy, the Federal Bureau of Investigation ("FBI") notified the Immigration and Naturalization Service ("INS") of aliens potentially involved in, or with knowledge of, the terrorist attacks. The INS placed these aliens on a custody list and then used all legal means available to detain them until they were cleared by the government.

Plaintiff Ahmad Farid Khorrami was one of the individuals held in INS custody pursuant to the "Hold Until Cleared" policy. The INS had "paroled" Khorrami into this country, pending adjudication of his Change of Status petition. But on September 18, 2001, after the FBI informed the INS of its investigative interest in Khorrami, the INS revoked his parole and placed him in investigative detention. The government held Khorrami in detention until December 14, 2001, when the INS granted him parole again.

After his release, Khorrami filed a civil action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against several INS and FBI agents, including defendant Michael Rolince, the then-current Section Chief of the FBI's International Terrorism Operations Section of the Counterterrorism Division. Khorrami's complaint alleged Rolince violated Khorrami's due process rights by signing a Declaration which falsely connected Khorrami to one of the September 11 terrorists. Following discovery, the district court granted Rolince summary judgment. Khorrami now appeals. Because the Declaration Rolince signed did not cause or extend Khorrami's detention, we affirm.

I.

In 1997, Ahmad Farid Khorrami, an Iranian-born British citizen, entered the United States on a temporary vocational visa. The visa expired in 2000. Two months after the visa expired, Khorrami's wife filed an I-130 petition for an alien adult relative visa. Khorrami then filed an I-485 petition for an adjustment of status to legal permanent resident as the spouse of a United States citizen. While those petitions were pending, Khorrami sought to travel to Canada. Because at that time Khorrami did not yet have legal status, he sought "advance parole" from the INS—"that is, assurance that he would be readmitted to the United States notwithstanding the lack of a visa." *Dimenski v. INS*, 275 F.3d 574, 576 (7th Cir. 2001) (citing 8 U. S. C. § 1182(d)(5)). The INS granted Khorrami advance parole in February 2001, and then, after visiting Canada, he was paroled back into the United States.

In 2001, Khorrami worked for Skyway Airlines in Milwaukee, Wisconsin and lived in Chicago, Illinois, with his wife. Following the September 11, 2001, terrorist attacks, Khorrami learned that the FBI was investigating him and questioning his friends and acquaintances. After learning of the government's interest in him, Khorrami contacted the FBI and voluntarily met with agents for several hours in his Chicago home. INS and Milwaukee FBI agents also interviewed Khorrami at the airport where he worked in Milwaukee and later at the FBI's Milwaukee field office. Then on

September 18, 2001, the INS revoked Khorrami's parole, initiated removal proceedings, and placed him in administrative detention in a jail in Waukesha, Wisconsin. He was later transferred to an Illinois detention facility.

The government's revocation of Khorrami's parole and its administrative detention of him were part of the "Hold Until Cleared" policy the DOJ enacted following the September 11 attacks. The DOJ adopted this policy after discovering that none of the September 11 terrorists were citizens of the United States; the government sought to ensure that it did not accidently release complicit aliens from custody, or remove them to another country where they could not be questioned.

Under the "Hold Until Cleared" policy, the FBI, INS,[1] and several sections of the DOJ worked together to monitor the status of aliens. In cases where "the FBI told the INS that the FBI had an investigative interest in an INS detainee lawfully detained on immigration charges," then "the INS would place the alien on a custody list and use all legal means to keep him in custody until the FBI no longer had an investigative interest in the alien."

Khorrami's first INS removal hearing was held on October 10, 2001. Before that hearing, Khorrami's attorney had filed a Motion to Terminate Removal Proceedings. In this motion, Khorrami's attorney argued the INS incorrectly categorized Khorrami as an arriving alien subject to removal and sought dismissal of the removal proceeding. His attorney also sought Khorrami's release on bond. The Immigration Judge ("IJ") noted she did not have authority to release Khorrami on bond, and then the court continued the hearing until October 24, 2001, to allow the INS the chance to respond to Khorrami's Motion to Terminate Removal Proceedings.

At the October 24, 2001, hearing, the IJ denied Khorrami's Motion to Terminate and found that Khorrami was an arriving alien and subject to removal as charged. But since Khorrami's wife had previously filed an I-130 adult relative visa petition and Khorrami had filed an I-485 petition for an adjustment of status to legal permanent resident as a spouse of a United States citizen, the IJ explained that she would not order Khorrami to be removed. Instead, the IJ continued the removal hearing until November 14, 2001, to allow the INS to process the pending I-130 petition. The IJ also noted, in

---

[1]    In 2003, the INS's responsibilities were transferred to Immigration and Customs Enforcement. Because the events underlying this lawsuit occurred before the change, we refer to the INS throughout this order.

response to Khorrami's attorney's request for bond, that bond was an entirely separate decision from the removal proceedings, and that as an arriving alien bond was not available.

The third hearing occurred on November 14. The IJ began those proceedings by noting that the INS had indicated that it had not been able to adjudicate the I-130 visa petition—a necessary prerequisite to an alien's I-485 motion for change of status—and that the INS anticipated it would be completed in two weeks. The court then handled a few housekeeping matters, after which the court asked the parties if they had anything further.

Khorrami's attorney responded that he wanted to review for the record what had occurred since the last hearing. The attorney then walked the judge through various interactions he, his client, and his client's wife had had with government agents over the last month. He noted, "[q]uite frankly, I think that the I-130 investigation is finished and this must have something to do with other issues. I understand you have no jurisdiction until they get to it … . I would ask that you do whatever you can to keep the pressure on the government to absolutely complete the investigation and come in with a decision before the 28th."

The IJ asked if the government had a response. At that point, the attorney for the INS explained that "it's also an investigation, as we all know, about what happened on September 11th; and the FBI has shown, in fact, is interested [sic] in this man. I have a declaration, … from the FBI which I found out yesterday, late, that could be released to the Immigration judge's office." The IJ then noted for the record that the document was "served." After that, the IJ thanked the INS's attorney for working to resolve the I-130 petition, and expressed hope it could be completed by the next hearing. The IJ then continued the hearing until December 12, 2001.

The Declaration the INS's attorney shared with the court had been signed by Michael Rolince, the then-current Section Chief of the FBI's International Terrorism Operations Section of the Counterterrorism Division. Rolince had oversight responsibility for the investigations conducted by the 96 domestic and international FBI offices. The Declaration stated that Rolince was "personally involved in and [had] significant supervisory responsibilities for the nationwide FBI investigation initiated in response to the series of deadly terrorist attacks which occurred on September 11, 2001. As such, I am privy both to the broad scope of and to particular details from the investigation."

After then detailing some general aspects of the government's investigation into September 11, 2011, Rolince's Declaration stated:

> "In the context of this terrorism investigation, the FBI identified individuals whose activities warranted further inquiry. When such individuals were identified as aliens who were believed to have violated their immigration status, the FBI notified the Immigration and Naturalization Service (INS). The INS detained such aliens under the authority of the Immigration and Nationality Act. At this point, the FBI must consider the possibility that these aliens are somehow linked to, or may possess knowledge useful to the investigation of, the terrorist attacks on the World Trade Center and the Pentagon. The respondent, **AHMAD FARID KHORRAMI,** … is one such individual."

Rolince next explained the government's interest in Khorrami, noting he was a pilot who "previously resided at an apartment building in Daytona Beach, FL, the same apartment building which is believed to be a known address for one suspected hijacker and a possible address for a second suspected hijacker. The investigation further indicates that KHORRAMI was a flight instructor at two flight instruction schools located in Florida, both of which were attended by one or more suspected hijackers." Additionally, Rolince attested in the Declaration that "KHORRAMI possesses a bank account which was opened prior to 1996, and which contains in excess of $100,000. Initial indications show that KHORRAMI inquired with bank personnel as to the potential traceability of the funds in that account and has shifted funds between accounts in his name."

Rolince signed the Declaration on November 9, 2001, attesting to the truthfulness of the information under penalty of perjury. Rolince, however, had not prepared the Declaration nor confirmed the veracity of the information contained in the Declaration. Rather, he reviewed the Declaration to assure the information supported the FBI's position that it had an investigative interest in Khorrami.

Instead, an FBI lawyer stationed in Washington D.C.—in this case Keith Eirinberg—drafted the Declaration. Eirinberg drafted the Declaration from information provided to him from a report authored by Milwaukee Supervisory FBI Special Agent Katherine Schweit. And Schweit compiled her report on Khorrami from information provided by other Milwaukee FBI agents. Eirinberg did not independently verify the

information Schweit had provided him in the report. Schweit also did not check the accuracy of the details provided to her by the Milwaukee agents.

Unfortunately, the information the Milwaukee agents provided to Schweit was not accurate. In turn, her report to Eirinberg was inaccurate and the Declaration Eirinberg prepared for Rolince, and which Rolince signed under penalty of perjury, was not accurate. Specifically, while Khorrami had lived in Florida and had attended a flight school there, none of the terrorists lived in the same apartment complex or attended the same flight school. The confusion apparently arose because a man with a name similar to one of the terrorists had resided in the same set of apartments as Khorrami and had attended the same flight school. (The terrorist was named Waleed Mohammed Al-Shehri and the individual unconnected with the attacks was named Waleed Ahmed Al-Shehri.)

While the FBI was initially suspicious of Khorrami following the September 11, attacks, FBI agents in Chicago and Jacksonville investigated and quickly discovered the errors. Additionally, a Chicago FBI agent had interviewed a bank employee and determined that the allegations about Khorrami's desire to transfer funds was not accurate. Within days of the revocation of Khorrami's parole, the Chicago FBI and the Jacksonville FBI offices sent electronic communications to the Counterterrorism Section clearing Khorrami.

Had Rolince reviewed the FBI's computer system for the most current details on the Bureau's investigation into Khorrami, he would have known the statements contained in the Declaration he signed were false. But he didn't. Rather, Rolince merely reviewed the Declaration and, trusting his team, he signed the Declaration believing the information to be truthful and accurate. After Rolince signed the Declaration, it was sent to INS field attorneys handling Khorrami's removal proceedings.

As noted above, the INS attorney referred to the Declaration at the third immigration hearing held on November 14, 2001, and the court noted it had been served. The IJ, however, did nothing in response to the Declaration, instead continuing the removal hearing until the December 12 hearing for another reason, so that the INS could continue or possiblycomplete considering the I-130 and I-485 petitions for Khorrami as the spouse of a U.S. citizen.

Before Khorrami's next hearing, the government discovered the mistake and on December 11, 2001, the Chicago FBI office sent a letter to the immigration court,

informing the IJ that the Declaration submitted to the court was inaccurate and that Khorrami was not, in fact, connected to the September 11, 2001, terrorists. Rolince also sent a letter dated December 12, 2001, to the Executive Associate Commissioner of Field Operations at the INS advising "that after consultation with FBI Headquarters and the appropriate field offices, the FBI has determined that presently there is no investigative interest" in Khorrami. Rolince added that "the FBI consents to the removal of Khorrami" from the custody list.

At the December 12 hearing before the IJ, the INS stated that Khorrami's background check had been completed and that it had approved his alien adult relative visa. The IJ stated she intended to continue the proceedings until January 9, 2002, so she could adjudicate Khorrami's petition for adjustment of status.

At that point, the IJ addressed Khorrami directly, stating: "Mr. Khorrami, they'll bring you back in on that day. If you're paroled by the District Director which I have no idea of what the District Director will do. I have no jurisdiction whatsoever over the District Director. If you're paroled, you will be set free into—to go back home, and your case will be rescheduled for [another location]. If you're still in custody, the case will be here."

Two days later, the District Director granted Khorrami parole and he was released from custody. Khorrami later succeeded in obtaining an adjustment of status to permanent resident, and he later became a United States citizen.

Following resolution of his immigration case, Khorrami sued various FBI and INS agents. The district court dismissed all of Khorrami's claims, except his *Bivens* action against Rolince in which he alleged that Rolince violated his due process rights by signing a false Declaration. Rolince had sought to dismiss Khorrami's *Bivens* claim based on qualified immunity in an interlocutory appeal to this court, but we held that based on the complaint's allegations it was premature to decide the issue of qualified immunity at that early stage. *Khorrami v. Rolince*, 539 F.3d 782 (7th Cir. 2008).

On remand, the parties proceeded with discovery, after which Rolince moved for summary judgment. The district court granted Rolince's motion for summary judgment, concluding it would be inappropriate to extend *Bivens* to the factual scenario underlying this case. Alternatively, the court found that Rolince was entitled to qualified immunity because he "committed no intentional wrongdoing or recklessness with regard to the information in the Rolince Declaration, and did not intend to

materially mislead this court with the attribution of the information in the Rolince Declaration." Khorrami appeals.

## II.

On appeal, Khorrami argues the district court erred in granting Rolince summary judgment on his *Bivens* claim. We review a decision to grant summary judgment *de novo,* reviewing the facts in the light most favorable to the non-moving party. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* We can affirm a decision on any basis in the record. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 n.1. (7th Cir. 2012).

Khorrami's main argument on appeal is that the district court erred in holding that he could not seek relief under *Bivens*. As we explained in *Engel v. Buchan*, 710 F.3d 698, 703 (7th Cir. 2013), "in *Bivens* the Supreme Court recognized an implied cause of action for damages against federal officers to redress a constitutional violation.… The Court did so notwithstanding the absence of a statutory right of action … ." But the Supreme Court has been hesitant to expand the right to sue under an implied cause of action, most recently demonstrating its reluctance to extend the *Bivens* doctrine to new settings in *Hernandez v. Mesa*, — U.S. —, 137 S. Ct. 2003, 2006 (2017) (per curiam).

Nonetheless, Khorrami argues that his complaint "presents garden-variety *Bivens* allegations," under which an implied right of action is appropriate. The government disagrees. We need not address this difficult question, however, for a very simple reason: Khorrami's due process claim against Rolince cannot possibly succeed because Rolince's signing of the false Declaration did not cause, or extend, Khorrami's detention.

In this case, Khorrami was detained in September when the INS revoked his parole. And Rolince's Declaration clearly did not cause the initial detention because he did not sign the Declaration until nearly two months later. Likewise, the IJ's decision that she lacked authority to release Khorrami on bond because he was an "arriving alien" was made before Rolince signed the Declaration. Further, the Declaration could have had no impact on that decision because the IJ's ruling was based solely on its conclusion that Khorrami was an "arriving alien," and as such, the court lacked authority to release him on bond. Thus, the Declaration also did not cause the IJ to deny Khorrami's release on bond.

It is true that the INS presented the Declaration to the IJ, but it did so in response to Khorrami's attorney's comments that "[q]uite frankly, I think that the I-130 investigation is finished and this must have something to do with other issues," and the IJ's request for a response. The INS replied that, yes, there was something more going on, the investigation into September 11, and the government's investigative interest in Khorrami. But that comment and the Declaration had no impact on Khorrami's detention, as demonstrated by the IJ's response: She took no further action in response to the Declaration, but merely continued the removal hearing for another reason, to give the INS more time to consider the pending I-130 and I-485 petitions.

Nor could the IJ have done anything in response to the Declaration. Khorrami was already in detention and even if the Declaration had correctly stated that he was not connected to the September 11 attacks, the IJ still could not have ordered Khorrami's release: the IJ lacked the authority to release Khorrami on bond and lacked authority to parole him or order the INS to parole him.

The IJ made this later point abundantly clear at the December 12 hearing when, after the INS informed the court that the Declaration was false and the government no longer had an interest in Khorrami, the IJ stated that: "If you're paroled by the District Director which I have no idea of what the District Director will do. I have no jurisdiction whatsoever over the District Director. If you're paroled, you will be set free into—to go back home, and your case will be rescheduled for [another location]. If you're still in custody, the case will be here."

For Khorrami to sustain a due process claim premised on the false Declaration, he must prove the evidence was used against him to deprive him of his liberty. *Armstrong v. Daily*, 786 F.3d 529, 553 (7th Cir. 2015). The mere act of creating false evidence does not implicate due process rights, unless that evidence is later used to deprive the individual of liberty in some way. *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012). Because the Declaration did not cause the IJ to detain or extend Khorrami's detention, he cannot possibly succeed on his claim against Rolince.

In response, Khorrami argues that Rolince's signing of the false Declaration extended his detention because it caused the INS's District Director to deny him parole. The evidence, however, does not support Khorrami's claim. Rather, the evidence shows that Khorrami's parole was revoked in September *before* Rolince signed the Declaration, and under the "Hold Until Cleared" policy the INS would continue to deny Khorrami

parole until it received a "no investigative interest" letter from Rolince stating that the FBI consented to the removal of the alien from the INS "Custody List." It was thus not the Declaration which caused Khorrami's continued detention, but the lack of a "no investigative interest" letter from Rolince. When Rolince finally issued that letter on December 12, 2001, the INS then released Khorrami on parole.

Khorrami posits that the Declaration nonetheless extended his detention because, had Rolince actually reviewed the computer system before signing the Declaration, he would have discovered the error and issued the "no investigative interest" letter at that time, which would have led to his release. However, this theory does not establish that the false Declaration actually caused Khorrami's prolonged detention—something required to prevail on his due process claim. *Id.* (explaining that to prevail on a due process claim, the plaintiff must, as with tort liability, establish the violation was both a "cause-in-fact" and the "proximate cause" of the alleged deprivation). Instead, this theory seeks to hold Rolince liable for not investigating the veracity of the Declaration. However, this court has held that there is no affirmative duty to investigate. *Id.* at 588. Therefore, Khorrami's attempt to side-step the lack of causation must fail. And because the Declaration did not cause or prolong Khorrami's detention, he cannot prevail on his due process claim. Accordingly, the district court properly granted Rolince summary judgment on his due process claim.[2]

## III.

Many innocent people suffered as a result of the September 11, 2001, terrorist attacks, including Khorrami. While tragic for all involved, Khorrami was legally detained under immigration law and Rolince's mistake in signing the false Declaration did not cause—or extend—that detention. Accordingly, the district court properly granted Rolince summary judgment on Khorrami's due process claim. We AFFIRM.

---

[2] The government also argued that Khorrami's claim fails because, even though the Declaration undisputedly included false information, there is no evidence that Rolince knew the information was false or acted recklessly in signing the statement. Khorrami counters that Rolince's Declaration falsely created the impression that he had personal knowledge of the evidence tying Khorrami to one of the September 11, 2001, terrorists, when in fact Rolince had no such knowledge. We need not resolve this dispute, though, because as discussed above, the Declaration did not cause or extend Khorrami's detention.