JILL PRYOR, Circuit Judge,
concurring in part and dissenting in part:
I join fully in the majority’s thorough analysis in Part. Ill addressing subject-matter jurisdiction. But I dissent- from Part IV of the majority opinion holding that plaintiff Santiago Alvarez has no remedy under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). More specifically, I dissent from the majority’s opinion affirming the district court’s dismissal of Alvarez’s claim against defendant Juan Munoz, although I concur with the majority’s decision to affirm the dismissal of Alvarez’s claims against defendants Robert Emery, Michael Gladish, Felicia Skinner, and Sheetul Wall.
In this case, Supreme Court precedent, a federal statute, and its accompanying regulations required U.S. Immigration and Customs Enforcement (“ICE”) to release Alvarez approximately 180 days after his removal order was final if there was no significant likelihood • that he would be removed in the reasonably foreseeable future. The majority acknowledges Alvarez’s allegation that Munoz, the ICE official-who reviewed ■ Alvarez’s dé-tention at the 180-day mark, “knew that [Alvarez] could not be removed — to Cuba, Spain, or any other country and never intended to remove-him.” Maj. Op. at 1204. As the majority recognizes, Alvarez alleged that Munoz improperly continued Alvarez’s detention knowing there were “no statutory grounds on which to detain him.” Id.-at 1205. Nonetheless, the majority concludes that Alvarez has no Bivens remedy because he failed to “allege[] that he was actively prevented from seeking any meaningful review and relief’ and thus- was “in no position to argue that the elaborate scheme - that Congress designed afforded him -no opportunity for a meaningful, remedy.” Id. at 1210 (internal quotation marks omitted). I am unable to reconcile the majority’s conclusion that Alvarez was afforded meaningful-review with his plausibly alleged claim that Munoz performed a sham review and continued, to detain him, knowing that the law required his .release. Accordingly, I disagree with the majority that Alvarez can have no Bivens remedy for his due process claim against Munoz.[1]
The district court dismissed Alvarez’s claims on the alternative.-grounds that (1) the claims were barred by Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); (2) the defendants were entitled to qualified immunity; and (3) -the claims were barred by-the statute *1214 of limitations. Because I believe that the district court erred in each of these determinations, I would vacate .the district court’s order and remand so that Alvarez’s due process claim against Munoz could proceed.[2]
I. Legal Background
As a starting point, it is important to understand the limits the law imposes on the Attorney General’s authority to continue to detain aliens after their removal orders are final. Although the Attorney General may detain certain aliens for a reasonable time after a final order of removal, the Executive Branch must periodically review its decision to continue an alien’s detention.
A. Statutory Authority
“[W]hen an alien-is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days.”[3] 8 U.S.C. § 1231(a)(1)(A). Until aliens are removed, the Attorney General must hold them in custody during this 90-day period. Id. § 1231(a)(2). Recognizing that the Attorney General will be unable' to remove every alien within the 90-day period, Congress has allowed (but does not require) the Attorney General to detain certain categories of aliens “beyond the removal period.”[4] Id. § 1231(a)(6). But in Zadvydas v. Davis, the United States Supreme Court read into this statute a requirement that the Attorney General may detain these aliens only for a “reasonable time” after their removal orders are final. 533 U.S. 678, 682, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (“[W]e construe the statute to contain an implicit ‘reasonable time’ limitation_”).
In Zadvydas, two aliens, who were detained for years after their final orders of removal because the Attorney General could find no country that would accept them, petitioned for habeas corpus relief. Id. at 684-86, 121 S.Ct. 2491. The government argued that § 1231(a)(6) authorized the Attorney General to detain indefinitely aliens subject to final orders of removal. Id. at 689, 121 S.Ct. 2491. The Supreme Court rejected this interpretation, explaining that indefinite detention would “raise a serious constitutional problem’! because it would violate the aliens’ Fifth Amendment rights under the Due Process Clause. Id. at 690, 121 S.Ct. 2491. Applying the canon of constitutional avoidance, the Court construed § 1231(a)(6) to include an implicit requirement that the Attorney General could detain an alien only -for the “period reasonably necessary to secure removal.” Id. at 699, 121 S.Ct. 2491. The Court recognized two independent factors that cabin the period reasonably necessary to secure an alien’s removal. First, when an alien’s “removal is no longer reasonably *1215 foreseeable,” the detention is “unreasonable and no longer authorized by statute.” Id. at 699-700, 121 S.Ct. 2491. Second, even if removal is reasonably foreseeable, the Attorney General may lack authority to detain an alien who. poses no risk. of committing further crimes. See id. at 700, 121 S.Ct. 2491 (“And if removal is reasonably foreseeable, the habeas court should consider the risk of the alien’s committing further crimes as a factor potentially justifying confinement within that reasonable removal period.”).
The Supreme Court then provided practical guidance about the length of time the Attorney General could detain an. alien after his removal order becomes final. Because the Executive Branch has primary responsibility for and expertise in foreign policy matters, the Supreme Court recognized that it must give “expert agencies decisionmaking leeway” and thus must “recognize some presumptively reasonable period of detention.” Id. at 700-01, 121 S.Ct. 2491. The Court therefore held that an alien’s detention for six months (approximately 180 days) after a final order of removal is “presumptively reasonable” under § 1231(a)(6). Id. at 701, 121 S.Ct. 2491. But after the expiration of this six-month period, the Attorney General has no power to detain an alien for whom “there is no significant likelihood of removal in the reasonably foreseeable future.”[5] Id.; accord Akinwale v. Ashcroft, 287 F.3d 1050, 1051-52 (11th Cir.2002). Importantly, “as the period of prior postremoval confinement grows, what counts as the ‘reasonably foreseeable future’ conversely would have to shrink.” Zadvydas, 533 U.S. at 701, 121 S.Ct. 2491.
B. Regulatory Authority
Consistent with Zadvydas, regulations now require ICE officials periodically to review the decision to continue to detain an alien subject to a final order of removal.[6] As I explain below, ICE officials must review the decision to detain an alien 90 days and again approximately 180 days after the alien’s removal order is final, as well as at least yearly thereafter. Importantly, ICE must release an -alien after the 180-day review if there is no significant likelihood that she will be removed in the reasonably foreseeable - future. But an alien no right to appeal a decision, upon review, to continue her detention.
1. 90-Day Review
When ICE is unable to remove an alien within 90 days of the removal order becoming final, it must review the alien’s detention before the end of that 90-day period (the “90-day review”). 8 C.F.R. § 241.4(k)(1)(i). After reviewing the alien’s records, a local ICE official may decide (but is not required) to release an alien whose “release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight.” Id. § 241.4(d), (h)(1), (k)(1). *1216 An ICE official may exercise her discretion to release an alien at the 90-day review stage only if she concludes that:
(1) Travel documents for the alien are not available or, in the opinion of the Service, immediate removal, while proper, is otherwise not practicable or not in the public interest;
(2) The detainee is presently a non-violent person;
(3) The detainee is likely to remain nonviolent if released;
(4) The detainee is not likely to pose a . threat to the community following release;
(5) The detainee is not likely to violate . the conditions of release; and
(6) The detainee does not pose a significant flight risk if released.
Id. § 241.4(e); see id. § 241.4(h)(3).[7]
An alien must receive written notice before the 90-day review occurs. Id. § 241.4(h)(2). She may submit written information supporting her release, which the ICE official must review, and she has the right to receive assistance in preparing her response. Id. § 241.4(h)(1), (2). The ICE official must provide the alien with a written -copy 'of the decision. Id. § 241.4(h)(4). If the ICE official decides to continue the alien’s detention, the decision must “set forth the reasons for the continued detention.” Id. § 241.4(d). The alien has no right to appeal a decision to continue detention at the 90-day review. Id.
2. 180-Day Review
If ICE continues to detain an alien after the 90-day review, ICE’s Headquarters Post-Order Detention Unit ' (the “HQPDU”) must review the alien’s detention approximately 180 days after the removal order becomes final (the “180-day review”).[8] Id. § 241.4(k)(2)(ii). The government concedes that, as part of the 180-day review, the HQPDU must consider whether the alien will be removed in the reasonably foreseeable future. If, at the 180-day review, the HQPDU determines “there is no significant likelihood that the alien will be removed in the reasonably foreseeable future,” then the alien must be released from custody “under 'appropriate conditions of supervision.”[9] Id. *1217 § 241.13(c); see § 241.4(i)(7). In deciding whether there is a significant likelihood of removal, the HQPDU must consider
all the facts of the cáse including ... the history of the alien’s efforts to comply with the order of removal, the history of the Service’s efforts to remove,aliens to the country in question or to third countries ..., the reasonably foreseeable results of those efforts, and the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question.
Id. § 241.13(f).[10]
Additionally, at the 180-day review, the HQPDU has discretion (but is not required) to release an alien if the “release will not pose a danger to the community or to the safety of-other persons or to property or a significant risk of flight.” Id. § 241.4(d)(1). When deciding whether to exercise this discretion, the HQPDU must make the same findings that are required to release an alien at the 90-day review. See id. § 241.4(e)-(f).
The regulations guarantee an alien certain procedural protections in connection with the 180-day review. The HQPDU must notify the alien before performing the 180-day review. Id. § 241.4(k)(2)(ii). If the HQPDU is going to continue detaining the alien, it must interview the alien in person. Id. § 241.4(i)(3)(i). The alien must have an opportunity to submit written information to support her release and may receive assistance from a person of her choice. Id. § 241.4(i)(3)(ii). The HQPDU must provide the alien with a written copy of the decision. Id. § 241.4(d). If the HQPDU decides to co'h-tinue the alien’s detention, the decision must “set forth the reasons for the continued detention.” Id. An alien has no right to appeal the HQPDU’s decision to continue her detention. Id.
II. Analysis
A. Bivens Remedy
I now turn to the central issue before us: whether Alvarez has a Bivens remedy for his claim that Munoz violated his Fifth Amendment right to due process[11] by deciding at the 180-day review to continue Alvarez’s detention despite knowing there *1218 was no significant likelihood he would be removed in the reasonably foreseeable future. I disagree with the majority’s broad, categorical holding that “a plaintiff cannot recover damages under Bivens for constitutional violations.that caused him to endure a prolonged immigration detention.” Maj Op. at 1208. Instead I would recognize a Bivens remedy in this particular case, limited to Alvarez’s claim against Munoz, because Alvarez has plausibly alleged that Munoz intentionally denied him meaningful administrative review when, despite knowing that Alvarez was required to be released, Munoz continued his detention.
In Bivens, the Supreme Court recognized that an individual had an implied private action for damages against federal officers who allegedly performed an illegal search of his home and arrested him without probable cause in violation of his Fourth Amendment rights. Bivens, 403 U.S. at 389-90, 91 S.Ct. 1999. It cannot be denied that the Supreme Court has declined to recognize a Bivens remedy in a “new context” in more than thirty-five years.[12] Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 67-68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). Nonetheless, “the Court has so" far adhered to Bivens’ core holding: Absent congressional command or special factors counseling hesitation, ‘victims of a constitutional violation by a federal agent have a right to recover damages'against the official in federal court despite the absence of any statute conferring such a right.’”. Wilkie v. Robbins, 551 U.S. 537, 576, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) (quoting Carlson v. Green, 446 U.S. 14, 18, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)). As the majority recognizes, the Supreme Court continues to decide on a case-by-case basis whether a Bivens remedy is available in a new context by considering whether (1) there is an “alternative, existing process for protecting the [constitutionally recognized] interest” that “amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy,” and (2) “special factors counsel[ ] hesitation before authorizing a new kind of federal litigation,” Minneci v. Pollard, — U.S. -, 132 S.Ct. 617, 621, 181 L.Ed.2d 606 (2012) (first alteration in original and internal quotation marks omitted).
Carefully applying this case-by-case approach, our Court has both explicitly and implicitly recognized Bivens remedies in new contexts. See, e.g., Muhammad v. Williams-Hubble, 380 Fed.Appx. 925, 926-27 (11th Cir.2010) (unpublished) (recognizing that Bivens remedy was available for inmate’s claim alleging that because he was Muslim, prison officials refused to accept his high school diploma, which would have entitled him to a higher pay grade for work performed while in custody); Magluta v. Samples, 375 F.3d 1269, 1284 (11th Cir.2004) (reversing dismissal of pretrial detainee’s Bivens claim alleging that Bureau of Prison officials violated his procedural due process rights under the Fifth Amendment when they placed him in administrative detention yet denied him review guaranteed by regulations); Uboh v. Reno, 141 F.3d 1000, 1002-03 (11th Cir.1998) (recognizing that a Fourth Amendment claim for malicious prosecution “constitute^] a cognizable Bivens claim” (internal quotation marks omitted)).[13]
*1219 1. Alternative Existing Processes
We begin by considering whether there were alternative existing processes to review Alvarez’s detention such that the courts should refrain from extending a damages remedy. See Minneci, 132 S.Ct. at 621. This inquiry requires us to consider whether Congress has explicitly or implicitly indicated “that the Court’s power” to recognize a money damages remedy for constitutional violations “should not be exercised.” Bush v. Lucas, 462 U.S. 367, 378, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). When an “administrative system created by Congress ‘provides meaningful remedies,’ ” no Bivens remedy is available, even if the alternatives fail to ‘“provide complete relief for the plaintiff.’ ” Schweiker v. Chilicky, 487 U.S. 412, 423, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (quoting Bush, 462 U.S. at 386, 388, 103 S.Ct. 2404). Although the majority and I agree that in deciding whether to extend a Bivens remedy we must consider whether the “existing process is sufficiently protective,” Maj. Op. at 1206, we disagree about whether that factor is met here.
The majority concludes that Alvarez “is in no position to argue that the elaborate scheme that Congress designed afforded him no opportunity for a meaningful remedy” because (1) ICE performed two custody determinations and “in each instance the agency found sufficient grounds to continue detaining him” and (2) Alvarez was able to petition for a writ of habeas corpus to challenge his detention.[14] Id, at 1209-10. But in light of Alvarez’s plausible claim that the 180-day review Munoz performed was a sham,[15] it cannot be that ICE’s periodic review was sufficiently protective. Because a habeas proceeding was the only *1220 meaningful way for Alvarez to receive review of his detention, I cannot conclude that Congress explicitly or implicitly indicated that the courts ‘should refrain from providing Alvarez a damages remedy.
As I explained above, ICE was required to release Alvarez if, at the 180-day review, there was “no significant likelihood” that he would “be removed in the reasonably foreseeable future.” 8 C.F.K. § 241.13(c); see id. § 241.4(i)(7). In his decision, Munoz acknowledged that Alvarez’s “removal to Cuba is not presently possible,” but found that' his removal' to Spain would occur in “the reasonably foreseeable future.” Decision to Continue Detention (Doc. 34-1); see Am. Compl. at ¶ 90 (Doc. 30).[16] Alvarez has alleged, however, that Munoz “knew the statements” about “Alvarez’s eligibility for Spanish citizenship and removal to Spain ... not to be tante and only made them to continue to detain and deprive ... Alvarez of his freedom and liberty.” Am. Compl. at ¶ 91 (Doc.30).
There is no disputé that Alvarez could be removed to Spain only if he were eligible for Spanish citizenship. The application for Spanish citizenship made clear that to be eligible Alvarez had to have an ancestor who fled Spain during the Spanish Civil War from 1936 to 1939. . But Alvarez’s Spanish 'ancestor, his grandfather, left Spain more than 60 years before the Spanish Civil War, making Alvarez ineligiblé for Spanish citizenship.
Alvarez has alleged sufficient facts to state a facially plausible claim[17] that Munoz knew Alvarez was ineligible for Spanish citizenship — and thus could not be removed to Spain — at the time when Munoz *1221 decided to continue Alvarez’s detention. Alvarez pled that an ICE agent provided him an incomplete application for Spanish citizenship that omitted the pages detailing the requirement that the applicant must have an ancestor who fled Spain during the Spanish Civil War. Because these pages would have shown that Alvarez was ineligible for Spanish citizenship, these allegations support an inference that the agent gave him an incomplete application knowing, but-attempting to hide, that he was ineligible for Spanish citizenship. Admittedly, Alvarez has not alleged that Munoz personally gave him the incomplete application. But by the time Munoz made the decision to continue detention,' Alvarez had told the habeas court about the incomplete application and explained why he was ineligible for Spanish citizenship. Because Munoz reviewed Alvarez’s entire- file, including all the materials Alvarez submitted to the habeas court,[18] it is reasonable to infer that Munoz knew Alvarez was ineligible for Spanish citizenship and could not be removed. If Munoz knew Alvarez could not be removed to Spain, then he had no basis for finding that Alvarez’s removal to Spain would occur in the reasonably foreseeable future and thus for continuing Alvarez’s detention. In other words, if we accept Alvarez’s well-pled allegations as true, as we must, he was affirmatively prevented from réceiving the meaningful review required under the regulations.[19]
Crediting Alvarez’s allegation that he was intentionally denied meaningful review by Munoz, I fail to see how Congress has indicated (either implicitly or explicitly) that courts should refrain from recognizing a Bivens remedy .under these circumstances, The majority asserts that because Congress has amended the Immigration and Naturalization Act and never added a private right of action, we should conclude that Congress intended to make damages unavailable. Maj. Op. at. 1209-10. Even assuming Congress, implicitly indicated (through its silence) that aliens who received meaningful review of their detention at the 90-day and 180-day reviews should have no damages remedy against the federal officials who continued their detention, I see no suggestion by Congress, even by its silence, indicating that Alvarez should have no damages remedy when he alleged that he was affirmatively denied thé review the law required.[20] See Arar v. Ashcroft, 585 F.3d 559, 573 (2d *1222 Cir.2009) (en banc) (explaining that “any reliance on the [Immigration and Nationality Act] as an alternative remedial scheme presents difficulties” because the alien “alleged that he was actively prevented from seeking any meaningful review and relief through the [Immigration and Nationality Act] processes”); Rauccio v. Frank, 750 F.Supp. 566, 571 (D.Conn.1990) (“In the instant case, the plaintiffs due process claim is premised on the defendants’ interference with the procedural mechanism which Congress has created— [Assuming plaintiffs' factual allegations to be true, defendants have rendered effectively unavailable any procedural safeguard established by Congress.”).
The majority implicitly takes the position that Alvarez received meaningful review, but it cites no case to support this conclusion. Although the majority relies on the Ninth Circuit’s decision in Mirmehdi v. United States, 689 F.3d 975 (9th Cir.2011), to suggest that other circuits have refused to recognize a Bivens remedy in the immigration context, nothing in Mirmehdi addressed whether a Bivens remedy is available when an alien is denied meaningful review through the very administrative procedures that the government asserts make a Bivens remedy urn necessary. In Mirmehdi, aliens with pending applications for asylum were arrested for immigration violations and then released on bond. Id. at 979. Their bond was revoked after FBI and ICE agents testified to evidence showing the aliens supported a terrorist group. Id. The aliens claimed the agents knowingly misrepresented evidence as showing that they belonged to the terrorist group so that the immigration judge would revoke their bond. M.The aliens .later sued the agents seeking a Bivens remedy for their wrongful detention claim.[21]
The Ninth Circuit held that no Bivens remedy was available because the aliens were able to “challenge their detention through not one but two different remedial systems.” Id. at 982. As the Ninth Circuit pointed out,,the aliens’ claim that the agents fabricated evidence was reviewed multiple times: (1) on direct appeal of them detention, (2) during administrative proceedings related to - their asylum applications, and (3) in a federal habeas corpus petition. Id. at 979, 982. Importantly, though, in Mirmehdi,the aliens raised no claim that this administrative and judicial review was a sham. Accordingly, Mir-mehdi never considered or addressed the question before the Court in this case: whether an alien could have received meaningful administrative review when he alleged that the only review of his claim (in a non-appealable decision, no less) was a sham.[22]
It is true that Alvarez could — and did— challenge his continued detention by peti *1223 tioning for a writ of habeas corpus in federal court. But given his plausible claim that he was intentionally denied, a meaningful 180-day review, petitioning for a writ of habeas corpus was the only way he could obtain review of his continued detention. And the existence of a habeas remedy alone — which gives aliens prospective, as opposed to retrospective, relief — is insufficient to support a conclusion that alternative remedies “amount to a convincing reason to refrain from” recognizing a Bivens remedy. Engel v. Buchan, 710 F.3d 698, 705-06 (7th Cir.2013) (internal quotation marks omitted).[23] Significantly, the government never argues — and no court has held — that a federal court can infer that Congress intended to foreclose a Bivens remedy solely from the fact that the plaintiff was able to challenge his unlawful detention or incarceration by petitioning for a writ of habeas corpus.[24]
Accepting Alvarez’s allegations, I cannot say that the sole alternative process available to review his unlawful‘continued detention — that is, petitioning for habeas relief — provides a compelling reason for the Court to refrain from recognizing a damages remedy.' Instead, the existence of habeas review alone is an insufficient basis for concluding that Congress intended to prohibit a damages remedy for Alvarez.
2. Special Factors Counseling Hesitation
The majority alternatively holds that no Bivens remedy is available because “nu *1224 merous special factors counsel hesitation in this context.” Maj. Op. at 1210. The majority identifies two special factors in this case: “the importance of demonstrating due respect for the Constitution’s separation of powers” and the difficulties associated with recognizing a “doctrinally novel and difficult to administer” claim.[25] Id. at 1210. After careful consideration, I rer main unconvinced that either of these special factors cautions hesitation in this case.
a. Separation of Powers
The majority contends that the need to demonstrate due respect for the separation of powers counsels hesitation here. Of course I agree that the Constitution gives “Congress the power to establish a uniform Rule of Naturalization” and that the Executive Branch has inherent authority to conduct relations with foreign nations. Id. at 1210 (internal quotation marks omitted). But' given Alvarez’s plausible claim that Munoz knew Alvarez could not be removed, I fail to see how such separation of powers concerns are implicated here. The majority offers no compelling reason why concerns about separation of powers are implicated when an ICE official’ intentionally deprives a detainee of his due process rights under governing law.
In fact, the government raised, and the Supreme Court rejected, a similar separation of powers argument in Zadvydas. The government argued that courts could not review a habeas petition challenging the Attorney General’s authority to detain indefinitely aliens who could not be removed because “the Judicial Branch must defer to Executive and Legislative Branch decisionmaking’ with respect to immigration law. Zadvydas, 533 U.S. at 695, 121 S.Ct. 2491. The Court rejected this argument, explaining that the Executive and Legislative Branches’ “power is subject to important constitutional limitations.” Id. When removal is impossible, judicial review of an alien’s detention in no way “den[ies] the right of Congress to remove aliens.” Id.' The Court also rejected the government’s assertion that judicial review would impinge the authority of Congress and the Executive Branch to control entry into the United States. Id. at 695-96, 121 S.Ct. 2491. For an alien detained after a final removal order is entered, “[t]he sole foreign policy consideration” is that review by the courts might “interfere with ‘sensitive’ repatriation negotiations.” Id. at 696, 121 S.Ct. 2491. The government failed to “explain how a ... court’s efforts to determine the likelihood of repatriation, if handled with appropriate, sensitivity, could make a significant difference in this respect.” [26] Id. For the same reasons, I am unpersuaded that judicial reviéw of ICE’s decision to continue detention in a Bivens action would upset the separation of powers when there is a plausible claim that the ICE official performing the review knew *1225 that the alien was entitled to release because he could not be removed to any other country.
I am troubled by the majority’s separation of powers analysis because, taken to its logical end, it would seem to foreclose a Bivens remedy in any case arising in the immigration context. - After all," if this ■case — in which Alvarez alleges that Munoz knew that the government had no country that would accept him — implicates' the Executive’s power to control and conduct foreign relations, then special factors would counsel hesitation in virtually all immigration cases.
b. Workability of Cause of Action
The majority also concludes that special factors counsel hesitation" because Alvarez’s claim is doctrinally novel and would be difficult to administer;. Although the workability of-a cause of action may indeed be a special factor counseling hesitation, see Wilkie, 551 U.S. at 555-56, 127 S.Ct. 2588, I fail to see how Alvarez’s claim, alleging that he was deprived due process when Munoz purposefully denied him meaningful review as required by the regulations, would be unworkable. In fact, his particular claim is neither doctrinally novel nor difficult to administer. First, I disagree that Alvarez’s allegation that he was denied meaningful review of his ongoing detention raises a novel claim. His resembles a classic procedural due process claim, alleging that a government official failed to provide "meaningful review as required under a law or policy. See, e.g., Williams v. Hobbs, 662 F.3d 994, 1008-09 (8th Cir.2011) (explaining that inmate failed to receive due process, even though process set forth in policy was adequate, when the review actually provided by prison officials was not meaningful); Ryan v. Ill. Dep’t of Children & Family Servs., 185 F.3d 751, 761-62 (7th Cir.1999) (reversing grant of summary judgment on procedural due process claim based oh plaintiffs’ evi dence showing that hearing was a “sham” because decisionmakers had already made up their minds); see also Zinermon v. Burch, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (“The Due Process clause also encompasses ... a guarantee of fair procedure.”); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 164, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) (explaining that due process requires that procedures provided must “not [be] a sham -or a pretense” (internal quotation marks omitted)).
The’ majority suggests' that Alvarez’s claim is different' from other procedural due process claims because a court would have to examine ICE’s motivation for continuing his detention. Even though a fact-finder ultimately would have to determine whether Munoz knew that Alvarez could not be removed to Spain, I fail to see why this inquiry makes Alvarez’s cause of action ’any ’ different from any other claim based on-an intentional deprivation of due process — much less unworkable. The majority offers no compelling explanation, t
The majority further asserts that Alvarez’s claim would require us to examine ICE’s motivation for continuing the detention of “every other alien who may be detained past the, statutory 90-day period.” Maj. Óp. at 1210-11. Again, I disagree. Alvarez makes no claim that ICE or Munoz had a policy or practice of performing sham 180-day reviews .to continue to detain aliens; why then would a court need to consider the reasons why ICE continued to detain other aliens beyond the 180-day review?
Seeond, I cannot agree with the majority’s assertion that Alvarez’s claim would be difficult to administer. The majority suggests that because ICE has discretion to abandon removal proceedings at any time, it would be particularly difficult to understand ICE’s motivations for continu *1226 ing a detention beyond the 180-day period. These two things are like apples and oranges: discretion to abandon removal proceedings altogether and discretion to continue detention after, a final order of removal are two. very different things. Further, as the majority concedes, Alvarez “does not allege that ICE should have exercised its discretion [to abandon removal proceedings] and released him.” Id. at 1205. Rather, Alvarez alleges that after the 180-day review, ICE denied him due process by failing to release him when it was required to do so because his removal was not reasonably foreseeable,. See Zadvydas, 533 U.S. at 699-700, 121 S.Ct. 2491; 8 C.F.R. §§ 241.4(i)(7), 241.13(c). Accordingly, I think that the Attorney General’s discretion to abandon removal proceedings poses no problem, in this case.
The majority worries that recognizing a Bivens remedy “would likely lead to widespread litigation” from aliens challenging their continued detention, Maj. Op, at 1211, but I believe their concerns.are overstated. Recognizing a Bivens remedy in this case would open the courthouse doors only to claims from aliens who: (1) were subject to a final ‘ order of removal, (2) were still detained at the end of the 90-day removal period, (3) had their detention continued at the 90-day review, (4) had their detention continued at the 180-day review, and (5) can state a plausible claim that the ICE official performing the'180-day review knew that the alien could not be removed in the reasonably foreseeable future. It is hard to believe this group of aliens is so large that they would flood the courts with litigation.[27] In any event, even assuming the majority is correct that a large group of aliens can plausibly allege that they received sham 180-day reviews, the concern that federal courts may have to address these plausible claims of serious constitutional violations hardly provides a compelling reason to refrain from hearing such claims.
I also remain unpersuaded by the majority’s contention that recognizing a Bivens remedy here would “chill ICE officials from engaging in robust enforcement of this country’s immigration laws.” Id. at 1211. Because the Bivens remedy I would recognize here would apply only to claims against those ICE officials who intentionally deny an alien a meaningful 180-day review, I fail to see how the prospect of the narrow judicial review I am proposing would chill ICE officials from performing their legitimate duties.
In sum, I cannot agree with the majority’s special factors analysis. Because I would hold, that the alternative, existing processes were inadequate, and special factors do not counsel hesitation, I would extend Alvarez a Bivens remedy.
B. Heck v. Humphrey
The district court. dismissed Alvarez’s claims against. all defendants, including Munoz, on the alternative ground that “the ‘favorable termination rule’ imposed by Heck ” barred his claims. Order at 16 (Doc. 58). In Heck, the Supreme Court recognized:
*1227 [T]o recover damages for allegedly unconstitutional conviction or . imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court’s issuance of a writ of habeas corpus.
Heck, 512 U.S. at 486-87, 114 S.Ct. 2364 (footnote omitted). Accordingly, the Court imposed a favorable-termination requirement, barring a damages action that “would necessarily imply the invalidity of [a] conviction or sentence ... unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.” Id. at 487, 114 S.Ct. 2364. We previously explained that the favorable termination requirement is inapplicable when “federal habeas corpus is not available.” Harden v. Pataki, 320 F.3d 1289, 1299 (11th Cir.2003);[28] see also Spencer v. Kemna, 523 U.S. 1, 21, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (Souter, J., concurring) (“[A] former prisoner, no longer ‘in custody,’ may bring a[n] ... action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy.”).[29]
Although Alvarez seeks damages arising from his unconstitutional continued detention, he cannot demonstrate that his detention has been declared invalid because the habeas court never issued a writ that called into question his detention. Nonetheless, I would hold that the favorable-termination requirement is inapplicable because under the facts of this ease federal habeas review was unavailable to Alvarez. Alvarez diligently petitioned for a writ of habeas corpus; indeed, the' district court scheduled a hearing on-his petition. But the government’s decision to release him just two business days before the hearing (quite possibly in an attempt to avoid judicial review of the unconstitutional detention) mooted his habeas petition challenging his detention[30] and made it impossible for him to obtain habeas relief that called into question his ongoing detention. Given this unique (and frankly troubling) procedural history, it would be illogical and unjust to hold that Alvarez’s claim against Munoz is barred because he failed to obtain habeas relief. Accordingly, I would hold that the district court erred in dismissing Alvarez’s claim against Munoz as barred under Heck.
C. Qualified Immunity
The district court held in the alternative that Alvarez’s claims were properly dismissed because all the defendants, including Munoz, were entitled to qualified im *1228 munity. I disagree with the district court’s analysis because it failed to consider that Alvarez’s procedural due process claim included-the plausible allegation that Munoz intentionally deprived him of meaningful review.
A government official asserting a qualified immunity defense bears the initial burden of showing “he was acting within his discretionary authority.”[31] Shop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir.2007). After the official -makes this showing, the burden shifts to the plaintiff to show -that “(1) the defendant violated a-constitutional right, and (2) this right was clearly established, at the time of the alleged violation.” Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir.2004). Binding decisions of the Supreme Court may clearly establish a right. See McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir.2007). The clearly-established requirement “ensures that officers will not be liable for damages unless they had “fair warning” that their conduct violated the law.” Id. (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).
Alvarez has stated a claim that Munoz violated his Fifth Amendment right to procedural due process by intentionally depriving Alvarez of meaningful review.[32] A procedural due process claim has three elements “(1) a .deprivation of a constitutionally-protected liberty or property interest; (2) [government] action; and (3) constitutionally-inadequate process.” Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir.2003). The only element at issue here is whether Alvarez received constitutionally inadequate process. As discussed in part in Section II-A above, Alvarez has pled sufficient facts to allege that he received constitutionally inadequate process when Munoz performed a sham review.
Further, Alvarez’s constitutional right was clearly established at the time that Munoz performed the sham 180-day review. Although due process may be “a flexible concept that varies with the particular circumstances of each case,” we have recognized that it is “clear that the government must, .provide” review “in a meaningful manner.” Id. at 1232-33 (internal quotation marks omitted); see Zinermon, 494 U.S. at 125, 110 S.Ct. 975 (due process requires “a guarantee of fair procedure”); McKinney v. Pate, 20 F.3d 1550, 1561 (11th Cir.1994) (en banc) (“It is axiomatic that, in general, the Constitution requires that the state provide fair procedures and an impartial decisionmaker before infringing on a person’s interest in life, liberty, or property.”). Given this precedent, it can hardly be argued that Munoz lacked fair warning that performing a sham 180-day review would violate Alvarez’s due process rights.
D. Statute of Limitations
The district court also dismissed Alvarez’s claims on the alternative ground that they were barred by the statute of limitations. Alvarez’s cause of action against *1229 Munoz accrued on or around October 14, 2009 — when he received Munoz’s decision to continue his detention-^ — because at that point he knew or had reason to know of his injury.[33] See Mullinax v. McElhenney 817 F.2d 711, 716 (11th Cir.1987). Alvarez sued Munoz less than. four years later. Because it is unclear from -the face of the complaint which state has the most significant relationship to Alyarez’s claim, it is impossible to determine at the motion to dismiss stage which state’s statute of limitations applies and thus whether Alvarez’s claim was timely. Accordingly, the district court erred in dismissing the claim against Munoz on statute of limitations grounds.
“A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate if it is apparent from the face of the complaint that the claim is time-barred.” Gonsalvez v. Celebrity Cruises Inc., 750 F.3d 1195, 1197 (11th Cir.2013) (internal quotation marks omitted). Because “[a] statute of limitations bar is an affirmative defense, ... plaintiff[s] [are] not required to negate” the affirmative defense in their complaint. La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir.2004) (alterations in original and internal quotation marks omitted). The district court’s statute of limitations analysis is flawed because it failed to consider whether it was apparent from the face of the complaint that the claim was time-barred.
The statute of limitations for Alvarez’s Bivens action is “the state limitation period applicable to personal injury actions” in the state where the suit was filed. Kelly v. Serna, 87 F.3d 1235, 1238 (11th Cir.1996). Alvarez'filed suit in Florida, so Florida law determines the limitation period. Florida courts generally apply a four-year statute of limitations to personal injury actions. Fla. Stat. § 95.11(3). But if a cause of action arose in another state with a shorter statute of limitations, Florida law requires use of the shorter statute of limitations. Id. § 95.10 (“When the cause of action arose in another state ’or territory of the United States, ... and its laws forbid the maintenánce of the action because of lapse ó¥ time, no action shall be maintained in this state.”). The purpose of this statute “is to discourage ‘forum shopping’ and the filing of lawsuits in Florida that have already, been barred in the jurisdiction where the cause of. action arose.” Celotex Corp. v. Meehan, 523 So.2d 141, 143 (Fla.1988).
Under Florida -law,, a cause of action arises in the state with the-most significant relationship to the action. Id. at 144. Florida courts “presume[ ] that the law of the place of the injury, will apply”; if, however, “another state has a more ‘significant relationship’ to . the particular issue, that state’s law should be applied.” McNeil v. CSX Transp., Inc., 832 So.2d 227, 229 (Fla.Dist.Ct.App.2002). To decide which state has the most significant relationship, Florida courts consider the following criteria: - - '
(a) the place where the injury occurred,
'(b) the place where the conduct causing injury Occurred, ’
(c)’the domicile], residence, nationality, place of incorporation and 'place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.
Celotex, 523 So.2d at 144. (quoting Restatement (Second) of. Conflict of Laws § Í45(2),(1971))¡
*1230 In this case, whether Alvarez’s claim against Munoz, is barred depends on where his cause of action arose. Munoz claims that Alvarez’s cause of action arose in Georgia and is barred by Georgia’s two-year statute of limitations. See O.C.G.A. § 9-3-33. Alvarez claims that it is unclear from the face of the complaint which state’s law governs his claim and that it is possible that Florida’s four-year statute of limitations applies, making his claim timely. Applying the significant factors test, I agree with Alvarez that it is not apparent from the face of his complaint which state had the most significant relationship 'to his cause of action against Munoz and thus whether his claim was barred.
Alvarez’s complaint shows that both Florida and Georgia had a relationship to Alvarez’s cause of action. Alvarez has alleged that his injury occurred in Georgia where he was detained and that Florida was his state of residence for over 50 years. But the complaint is silent about other contacts relevant to the significant-relationship analysis, including where Munoz resided; where Munoz’s conduct causing Alvarez’s injury occurred, for example, where Munoz made the decision to continue Alvarez’s detention; and the place where the parties’ relationship was centered. Because I cannot conclude from the face of the complaint that Alvarez’s claim necessarily is time-barred, dismissal on statute, of limitations grounds was error at this stage of the proceeding.
III. Conclusion
The allegations in this case are disturbing. They suggest that an ICE official ignored the law, intentionally deprived Alvarez of meaningful review, and knowingly made false statements to keep him in custody when the law required him to be released. The majority’s analysis in this case is also troubling. To deny a Bivens remedy, the majority seems to cast aside the motion to dismiss standard by ignoring Alvarez’s well-pled allegation that Munoz purposefully denied him meaningful review under the- existing regulations and procedures. After properly applying the motion to dismiss standard and crediting Alvarez’s plausible allegations, I would recognize that Alvarez has a Bivens remedy for his due process claim against Munoz.’ I would also hold that the district court erred in its alternative conclusions that Heck v. Humphrey, qualified immunity, and the statute of limitations barred Alvarez’s claim. I dissent because I would allow Alvarez’s claim against Munoz to proceed.

. The majority properly affirms the dismissal of Alvarez’s claims against Emery, Gladish, Skinner,.and Wall. The claims against Emery arose out of actions that he took before Alvarez was subject to a final removal order. I agree with the majority that we lack jurisdiction under 8 U.S.C. § 1252(g) to consider these claims. See Maj. Op. at 1202-04.
Alvarez’s claims against Skinner arose out of her refusal to expedite, his 90-day review- and her decision to continue his detention at the 90-day review. I agree with the majority that no Bivens. remedy is available for Alvarez’s claims against Skinner because he failed to allege a plausible factual basis for his allegation that Skinner intentionally denied him - meaningful review. See infra note 15.
Alvarez - alleged that Gladish and Wall knowingly made false statements — in a motion for extension Of time to respond to Alvarez's habeas petition and in a supporting declaration — for the purpose of delaying the habeas court’s review of Alvarez’s challenge to his detention.. These claims were properly ' dismissed "because Alvarez failed to allege a factual basis- for his allegation that Gladish and Wall knew that their statements that, he could not be removed to Spain in the reasonably foreseeable future were false. See infra note 19.

. Although the majority does not discuss the district court’s alternative holdings, I address them to show why none of the alternative grounds supports the district court’s dismissal of Alvarez's claim against Munoz.

. There is no dispute that the 90-day removal period began to run when Alvarez’s removal order became administratively final on January 22, 2009. See 8 U.S.C. § 1231(a)(1)(B).

. Aliens who may be detained beyond the 90-day removal period- include those who: (1) are removable because they committed certain criminal offenses, (2) engaged in criminal activities that endangered public safety or national security, or (3) pose a risk to the community or are unlikely to comply with a removal order. See 8 U.S.C. § 1231(a)(6) (identifying aliens who may be detained beyond 90-day removal period to include aliens who are removable under § 1227(a)(2)). There is no question that the Attorney General was authorized to detain Alvarez beyond the 90-day removal period because he was removable based on' his conviction of an aggravated felony and an offense related to unlawfully ■ possessing firearms. See id. § 1227(a)(2)(A)(iii), (a)(2)(C).

. When it releases an alien subject to a final order of removal, the government may impose appropriate conditions of supervised release. An alien who violates these conditions may be taken back into custody. Zadvydas, 533 U.S. at 700, 121 S.Ct. 2491.

. After Zadvydas, the regulations were substantially revised to "add[ ] new provisions to govern determinations ... as to whether there is a significant likelihood that an alien will be removed from the United States in the reasonably foreseeable future.” Continued Detention of Aliens Subject to Final Orders of Removal, 66 Fed.Reg. 56967, 56967 (Nov. 14, 2001); see id. at 56968 (“In light of the Supreme Court’s decision in Zadvydas, this rule revises the Department’s regulations by adding a new 8 CFR 241.13, governing certain aspects of the custody determination of a detained alien after the expiration of the removal period. Specifically, the rule provides a process for [ICE] to make a determination as to whether there is a significant likelihood that the alien will be removed in the reasonably foreseeable future.”).

.In applying these factors, an ICE official considers: (1) "disciplinary infractions or incident reports received” while the alien was incarcerated or in custody; .(2) the alien’s "criminal conduct and criminal convictions, including consideration of the nature and severity of the alien’s convictions, sentences imposed and time actually served, probation and criminal parole history, evidence of recidivism, and other criminal history”; (3) "[a]rty available psychiatric and psychological reports”; (4) "[e]vidence of rehabilitation including institutional progress relating to participation in work, educational, and vocational programs, where available”; (5) "[f]a- ■ vorable factors, including ties to the United States such as the number of close relatives ■ residing here lawfully”; (6) "[p]rior immigration violations”; (7) "[t]he likelihood that the ■ alien is a significant flight risk”; and (8) "other information that is probative of whether the alien is likely to” adjust to life in a community, engage in future violence or criminal activity, pose a danger to persons or property, or violate the conditions of his release pending removal. 8 C.F.R. § 241.4(f), (h)(3).

. As noted above, Alvarez’s removal order became final on January 22, 2009. On April 22, 2009, exactly 90 days later, Skinner issued her decision to continue his detention. On October 14, 2009, 265 days after the removal order was final, Munoz issued his decision to continue detention. Although it appears that Munoz completed the 180-day review three months late, the regulations, provide some leeway, permitting the 180-day review to be completed within 180 days of the final order of removal "or as soon thereafter as practicable.” 8 C.F.R. § 241.4(k)(2)(ii).

. Under the regulations, an alien may submit a written request that the HQPDU review *1217 whether there is a significant likelihood of removal in the reasonably foreseeable future “any time after the removal order becomes final.” 8 C.F.R. § 241.13(c), (d)(3). But the HQPDU may postpone consideration of the request until the 90-day removal period expires. Id. § 241.13(d)(3). Moreover, the HQPDU "has no obligation' to release an alien” until six months after the alien’s removal order is final. Id. § 241.13(b)(2)(ii). Thus, the 180-day review is the first point at which an alien must be released if there is no significant likelihood of removal in the reasonably foreseeable future.

. Even when there is no significant likelihood of removal in the reasonably foreseeable future, ICE may continue to detain an alien if "special circumstances” • warrant continued detention. 8 C.F.R. § 241.14. Special circumstances exist when: (1) the alien has a highly contagious disease that poses a threat to public safety; (2) the, alien’s release is likely to have serious,' adverse foreign policy consequences; (3) the alien's release poses a significant threat to national security or a significant risk of terrorism; or (4) the alien is “specially dangerous.” Id. § 241.14(b)-(d), (f). There is no contention that special circumstances were present in this case.

. The Fifth Amendment, of course, guarantees due process. See U,,S. Const, amend V ("No person shall ... be deprived of ... liberty ... without due process of law____”). Aliens like Alvarez are entitled to due process protections. See Zadvydas, 533 U.S, at 693, 121 S.Ct. 2491 ("[T]he Due Process Clause applies to all ‘persons’. within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.”); Reno v. Flores, 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.”).

. I agree with the majority that here Alvarez asks us to recognize a Bivens remedy in a new context.

, Other circuits also have recognized Bivens remedies in new contexts, including in claims arising out of immigration detention. See Turkmen v. Hasty, 789 F.3d 218, 237 (2d Cir.) (extending a Bivens remedy to a claim alleging punitive conditions of confinement in the immigration detention context), reh’g en banc denied, 808 F.3d 197 (2d Cir.2015); Martinez-Aguero v. Gonzalez, 459 F.3d 618, 625 (5th Cir.2006) (permitting alien to seek a Bivens remedy for Fourth Amendment claim against border patrol agents for unlawful arrest and *1219 excessive use of force); see also Engel v. Buchan, 710 F.3d 698, 699 (7th Cir.2013) (recognizing a Bivens remedy for alleged violations of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)); Bistrian v. Levi, 696 F.3d 352, 376 n. 9 (3d Cir.2012) ("[A] federal cause of action for damages may be implied directly from the [F]irst [A]mendment.” (second and third alterations in original and internal quotation marks omitted)); Robbins v. Wilkie, 300 F.3d 1208, 1210, 1212 (10th Cir.2002) (extending Bivens remedy to ranch owner alleging that federal employees violated his constitutional rights by.trying to force him to grant an easement to federal agency); Krueger v. Lyng, 927 F.2d 1050, 1057 (8th Cir.1991) (recognizing former employee of county office of federal agency had a Bivens remedy for claim against federal government officers responsible for his termination); Dunbar Corp. v. Lindsey, 905 F.2d 754, 755, 761 (4th Cir.1990) (recognizing that land purchaser had Bivens remedy for claim that federal employees violated his Fifth Amendment rights when they improperly seized his land),

. The majority discusses that Congress "provided for a host of review procedures tailored to the differently situated groups of aliens that may be present in the United States” and lists both the review procedures under § 241.4 as well as procedures available to aliens applying for asylum, challenging a removal order, or seeking to reopen removal procedures on the basis of newly discovered facts. Maj. Op. at 1208-09. I do not dispute that Congress provided a variety of review procedures within an extensive statutory scheme. But aside from the review procedures under § 241.4, which Alvarez alleged Munoz purposefully circumvented, the particular review procedures the majority discusses are irrelevant to whether Alvarez had a meaningful opportunity to challenge his continued detention after his final order of removal.

. As I noted above, ICE performed a 90-day custody review as well. But Alvarez has failed to make a plausible allegation that Skinner denied him meaningful review. When Skinner continued his detention at the 90-day review, she was not required to consider whether there was a significant likelihood that Alvarez would be removed in the reasonable foreseeable future. See 8 C.F.R. § 241.4(i)(7); Zadvydas, 533 U.S. at 701, 121 S.Ct. 2491.
. It is true that at the 90-day review Skinner had discretion to release him if she determined that he posed no danger to the community and was not a flight risk. 8 C.F.R. § 241.4(d)(1). Although Alvarez alleged in his complaint that Skinner knew he posed no *1220 danger to the community or a flight risk, his allegation was only conclusory. He alleged that he submitted documentation to Skinner "demonstrating that [he] was not a 'flight risk’ or a danger to the community.’’ Am. Compl. at 1 65 (Doc. 30). (Citations to "Doc,” refer to docket, entries in the district court record in this case). But the allegation that Alvarez provided some evidence showing he posed no flight risk or danger to the community cannot establish that Skinner knew he posed no danger to the community, especially considering his prior conviction for conspiracy to possess illegal weapons.
Alvarez also contends that Skinner must have known in April 2009 that he posed no danger to the community or flight risk because ICE released him six months later. I disagree. Even assuming that when ICE released Alvarez in October 2009, it implicitly determined that he posed no danger to the community and was not a flight risk at that time, his release in no way shows that Skinner knew he was not a danger to the community or a flight risk nearly six months earlier when she decided to continue his detention. Because Alvarez has failed plausibly to allege ■ that he was denied meaningful administrative review at the 90-day review stage, I agree with the majority’s implicit conclusion that he has no Bivens remedy arising out of his detention after the 90-day review but before the 180-day review.

. Like the majority, I consider the content of Munoz’s Decision to Continue Detention, Gladish’s declaration filed in the habeas action (to the extent it discusses the government’s request that Alvarez complete an application for Spanish citizenship), Alvarez’s declaration filed in the habeas action (to the extent it discussés the Spanish citizenship application), and similar materials, even though they were attached to the defendants' motion to dismiss, instead of Alvarez's complaint. I acknowledge that "[t]ypically, a Rule 12(b)(6) motion to dismiss must be decided without considering matters outside of or unattached to the complaint,” which would preclude us from considering these documents, filed as exhibits to the defendants’ motion to dismiss. Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1053 n. 12 (11th Cir.2015). But these documents may be considered because they are (1) "central to a claim in the complaint" and (2) their "authenticity is unchallenged.” Id.

. See Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir.2012) (recognizing that a pleading must state a claim to relief that is plausible on its face’ ” (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009))).

. There is no dispute that as part of the 180-day review, Munoz was required to review Alvarez’s records. See 8 C.F.R. § 241.4(i)(2). And Munoz explained in his decision that he had reviewed Alvarez’s file, including any information Alvarez had submitted.

. In contrast, Alvarez’s allegation that Gladish and Wall knowingly misrepresented to the habeas court his eligibility for Spanish citizenship is unsupported by factual. content. Alvarez alleged that Gladish and Wall made knowingly false statements to the habeas court that he would be removed to Spain in the reasonably foreseeable future. But Alvarez has alleged no facts to support his conclusion that at the time Gladish and Wall made these statements they knew that he could-not be removed in the reasonably foreseeable future. He has alleged no facts that show (directly or indirectly) that these two defendants knew when Alvarez’s grandfather left .Spain or that another ICE officer had given Alvarez an incomplete application for Spanish citizenship. Accordingly, even if Alvarez had a Bivens remedy against Gladish and Wall, the claims properly were dismissed because he failed to state a' plausible claim that they ‘ knowingly deprived him of liberty by continuing his detention.

,Although the majority says that it leaves for another day the question of whether a Bivens remedy would be available when an alien alleges that he was subject to physical abuse or punitive confinement conditions, Maj. Op. at 1207-08 n. 6, I fear that courts . and litigants-in the future may read the majority’s broad reasoning to' foreclose a Bivens remedy for such claims. Yet, other circuits have recognized that a Bivens remedy is available for such claims, implicitly rejecting the *1222 position that no Bivens remedy should ever be available in the immigration detention context. See, e.g., De La Paz v. Coy, 786 F.3d 367, 374 (5th Cir.) (explaining that a Bivens remedy is available for a claim arising out of civil immigration apprehension or detention alleging unconstitutionally excessive use of force), reh'g denied; 804 F.3d 1200 (5th Cir.2015), petition for cert. filed, (U.S. Jan. 26, 2016) (No. 15-888).

. The aliens in Mirmehdi ultimately were granted withholding of removal and released because they demonstrated a likelihood of mistreatment if removed to Iran. 689 F.3d at 979-80.

. The majority’s reliance on De La Paz is flawed for similar reasons. Although the Fifth Circuit broadly characterized the issue as "whether Bivens extends-to claims arising from civil immigration apprehensions and detentions, other than those alleging unconstitu- • tionally excessive force,” De La Paz, 786 F.3d at 375, the Fifth Circuit’s analysis never addressed whether a Biveris remedy was available when an alien plausibly alleged that he was intentionally denied meaningful review of his unlawful detention. In De La Paz, two undocumented aliens, who were arrested by customs and border patrol, sued seeking money damages against the agents, alleging the agents violated their Fourth Amendment *1223 rights by performing an illegal stop. Id. at 369. In refusing to recognize a Bivens remedy, the Fifth Circuit relied on the existing “ ‘[fiederal governance of immigration and alien status,’ " which was " 'extensive and complex.’ ” Id. at 375 (alteration in original) (quoting Arizona v. United States, — U.S. -, 132 S.Ct. 2492, 2499, 183 L.Ed.2d 351 (2012)). The Fifth Circuit pointed to statutes limiting when border patrol agents may search or arrest a person, statutes guaranteeing aliens certain procedural safeguards after arrest, and regulations requiring the Department of Homeland Security to investigate alleged Fourth Amendment violations. Id. at 376. Given this remedial scheme, the Fifth Circuit concluded that “Congress’s failure to provide an individual damages remedy 'has not been inadvertent.' ” Id. at 377 (quoting Schweiker, 487 U.S. at 423, 108 S.Ct. 2460). But De La Paz did not address whether a Bivens remedy should be available where the defendants actively prevented the plaintiffs from receiving meaningful review under the applicable statutes and regulations.

. When a habeas remedy is coupled with a “broader, integrated remedial scheme” that can meaningfully address the deprivation, then the availability of a habeas remedy weighs against recognizing a Bivens remedy. Engel, 710 F.3d at 706; see also Rauschenberg v. Williamson, 785 F.2d 985, 987 (11th Cir.1986) (declining to extend Bivens remedy when parolee had alternative remedies available to challenge condition of his parole including, but not limited to, petitioning for habeas corpus relief). In other words, I am not saying that the availability of a habeas remedy has no significance in a Bivens analysis, but when habeas is the only available remedy, a court should not conclude that Congress intended to foreclose a Bivens remedy.

. The majority also suggests, that another alternative was available because Alvarez made an informal request to Skinner that she expedite the 90-day review of his case and release him before the end of the 90-day period. See Maj. Op. at 1209-10. Given that detention for 90 days after Alvarez's final removal order was mandatory, 8 U.S.C. § 1231(a)(2), I fail to see how this futile request constituted a meaningful alternative remedy. It is true that Alvarez could have requested release between the 90-day and 180-day reviews on the ground that there was no significant likelihood he would be removed in the reasonably foreseeable future, 8 C.F.R. § 241.13(c), (d)(3). But under the regulations, the government had "no obligation" to release Alvarez on this basis until ,six months after his removal order became final. Id. § 241.13(b)(2)(ii). Given this important limitation, if Alvarez had requested release between the 90-day and 180-day review, the request would have been futile.

. The majority offers the availability of “adequate remedial mechanisms” under the existing legislative and regulatory framework as a third' special factor counseling hesitation. Máj. Op, at 1210 (internal quotation marks omitted). But this is merely a restatement of the majority’s reasoning that no Bivens remedy is available because of existing alternative remedies. As I explained above, given Alvarez’s allegation that Munoz intentionally denied him meaningful review, I cannot say that the government provided adequate administrative review or remedial measures.

. .The Court recognized that in cases involving "terrorism or other special circumstances," "special arguments might be made for ... heightened deference to the judgments of the political branches with respect to matters of national security.” Zadvydas, 533 U.S. at 696, 121 S.Ct. 2491. But here the government makes no argument that judicial review of Alvarez’s continued detention would implicate national security concerns.

. Indeed, the available data suggests this group of aliens is relatively small. In 2006, the government detained a total of 8,690 aliens nationwide after a final order of removal was entered. Only 1,725 of those aliens' were detained 90 days after their final order was entered. See Office of Inspector General, ICE’s Compliance with Detention Limits for Aliens with a Final Order of Removal from the United States 11 (2007). The Bivens remedy I would recognize in this case would be available to only a subset of the latter group of aliens. ' And perhaps if a Bivens remedy were available to aliens whom ICE intentionally unlawfully detained, the existence of such a reniedy would have a deterrent effect, reducing the numbers further.

. We have in unpublished decisions suggested that this analysis in Harden was dicta. See, e.g., Vickers v. Donahue, 137 Fed.Appx. 285, 288-90 (11th Cir.2005) (unpublished). Even if the discussion in Harden is non-binding, however, the Court should adopt Harden’s well-reasoned analysis.

. We have never addressed whether Heck’s rule applies to aliens who challenge their immigration detention as unconstitutional. I assume for purposes of my analysis that Heck can apply to such claims.

. See Dawson v. Scott, 50 F.3d 884, 886 n. 2 (11th Cir.1995). Alvarez continued to seek habeas relief by challenging the conditions of release imposed by the government, which he contended restricted his freedom of action or movement, but his challenge did not address his lengthy detention. See Alvarez v. Holder, 454 Fed.Appx. 769, 772-73 (11th Cir.2011) (unpublished).

. Alvarez does not challenge the district court’s, conclusion that each defendant was carrying out a discretionary function at the time of the alleged constitutional violations.

. Alvarez also brought a Fourth Amendment claim against Munoz. But the Fourth Amendment claim fails because ICE had probable cause to detain him when it lodged the immigration detainer. The Supreme Court has explained that a challenge to continued detention is better understood as a Fifth Amendment due process claim than as a Fourth Amendment illegal seizure claim. See Baker v. McCollan, 443 U.S. 137, 144, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (recognizing that there is a due.process violation when a person is “detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment”).

. Alvarez argues that his claim did not accrue until we issued, a decision regarding his habeas claim. See Alvarez v. Holder, 454 Fed.Appx. 769 (11th Cir.2011) (unpublished). Alvarez wrongly assumes that our decision on his habeas claim held his detention unconstitutional. But we never addressed the legality of his immigration detention, only the conditions of his supervised release. Id.